**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| WHITING PETROLEUM CORPORATION, *et al.*,[1] | ) Case No. 20-32021 (DRJ) |
| | ) |
| | ) (Joint Administration Requested) |
| Debtors. | ) (Emergency Hearing Requested) |
| | ) |

**DECLARATION OF JEFFREY S. STEIN,**
**CHIEF RESTRUCTURING OFFICER OF WHITING**
**PETROLEUM CORPORATION, IN SUPPORT OF CHAPTER 11 PETITIONS**

I, Jeffrey S. Stein, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer of Whiting Petroleum Corporation ("Whiting"), a corporation organized under the laws of Delaware and one of the above-captioned debtors and debtors in possession (together with Whiting, collectively, the "Debtors"). On March 9, 2020, I was appointed as Chief Restructuring Officer of Whiting.  As Chief Restructuring Officer, my responsibilities include evaluating restructuring and refinancing alternatives regarding Whiting and its subsidiaries and negotiating with the Debtors' stakeholders. In my capacity as Chief Restructuring Officer, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2.      In addition, I am the Managing Partner of Stein Advisors LLC, which is a financial advisory firm that provides consulting services to public and private companies and institutional investors.  In this role, I have been engaged as a director and/or officer to support various

---

[1]     The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are:  Whiting Canadian Holding Company Unlimited Liability Corporation (3662); Whiting Petroleum Corporation (8515); Whiting US Holding Company (2900); Whiting Oil and Gas Corporation (8829); and Whiting Resources Corporation (1218). The location of the debtors' service address is: 1700 Lincoln Street, Suite 4700, Denver, Colorado 80203.

companies experiencing significant challenges, including financial restructuring, increased regulatory oversight, and emergence from bankruptcy.  I currently serve as the chief restructuring officer for Philadelphia Energy Solutions and recently served as the chief restructuring officer of Westmoreland Coal Company.  Prior to founding Stein Advisors LLC in 2010, from January 2003 through December 2009, I served as Principal of Durham Asset Management LLC, which is a global event-driven distressed debt and special situations equity asset management firm I co-founded.  In that capacity, I was responsible for the identification, evaluation and management of investments for various investment portfolios.  From July 1997 to December 2002, I served as Co-Director of Research at The Delaware Bay Company, Inc., which is a boutique research and investment banking firm focused on the distressed debt and special situations equity asset classes. From September 1991 to August 1995, I was an Associate and Assistant Vice President at Shearson Lehman Brothers in the Capital Preservation and Restructuring Group.  I received a B.A. in Economics from Brandeis University and an M.B.A. with Honors in Finance and Accounting from New York University.

3.      I submit this declaration (this "Declaration") to assist the United States Bankruptcy Court for the Southern District of Texas (the "Court") and parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed with the Court on the date hereof (the "Petition Date").

4.      Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' employees, operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and their advisors, or my opinion based on my experience, knowledge,

and information concerning the Debtors' operations, financial affairs, and restructuring initiatives. I am over the age of 18, and I am authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

### Introduction

5.      The Debtors ended 2019 standing on solid ground.  While the Debtors had more than $1 billion in unsecured bond debt set to mature prior to December 2020, the Debtors had significant financial flexibility to restructure their capital structure.  Most importantly, the Debtors began 2020 with a committed revolving credit facility that provided them with committed financing of up to $1.75 billion—more than enough liquidity to service the Debtors' 2020 maturities and fund anticipated capital expenditure needs throughout the year.  For these reasons, the Debtors secured a "clean" audit report as recently as February 27, 2020.[2]

6.      At the same time, the Debtors began to take proactive steps to optimize their balance sheet and capital needs.  The Debtors recognized that their current asset mix may be insufficient to best position their business for the long term and, for that reason, the Debtors engaged advisors—including Moelis & Company ("Moelis") as financial advisor and Kirkland & Ellis LLP ("Kirkland") as restructuring counsel—to supplement their existing advisor roster and chart a path forward.  Through January and February 2020, the Debtors and their advisors focused on numerous potential alternatives, including merger and acquisition, sale, and consensual recapitalization options, to expand the size of their business enterprise and address their funded indebtedness, particularly their senior unsecured note maturities in 2021, 2023, and 2026.

---

[2]    On February 27, 2020, the Debtors filed their 10-K annual report with the Securities and Exchange Commission with a clean audit report and no going-concern qualification.

The Debtors also began to evaluate potential liability management transactions (including a potential restructuring) to reduce their aggregate funded indebtedness, with the goal of addressing their funded debt maturities prior to December 2020, when the RBL Facility (as defined below) matures absent repayment of the Debtors' senior unsecured notes due 2021.  To facilitate these efforts, the Debtors: (a) commissioned updated noteholder identification reports; (b) engaged with the Debtors' largest unsecured noteholders regarding the need for a potential restructuring; and (c) encouraged their unsecured noteholders to organize and engage legal counsel and a financial adviser.

7.      Through this period of early evaluation, the Debtors fully expected to utilize availability under the RBL Facility to make the $190 million maturity payment of the convertible notes on April 1, 2020, which the Debtors believed would best position their enterprise to address their bond maturities in 2021, 2023, and 2026.

8.      However, in the latter half of March 2020, drastic and unprecedented global events, including a "price war" between OPEC and Russia and the macroeconomic effects of the COVID-19 pandemic, forced the Debtors to move quickly to reevaluate their financial position and immediate next steps.  On March 9, 2020, the West Texas Intermediate ("WTI") index—the benchmark for U.S.-based oil exploration and production companies—declined *24.59% in a single* day.  Since mid-March, major oil indexes experienced numerous subsequent drops and U.S. indexes have hovered around $20 per barrel—a level unseen in nearly twenty years.  The market turmoil in March took a toll on both energy markets and the financial system as a whole, as institutions grapple with significant levels of economic uncertainty.  The corresponding effect of these trends on Whiting's common stock has been devastating.  Between March 2 and March 27, Whiting's stock price dropped from $1.70/share to $0.80/share, a drop of approximately 53%.

9.      The recent extreme and sudden downturn fundamentally changed the economic landscape surrounding the Debtors' deleveraging options.  Whiting and its Board of Directors immediately snapped into action to address the unprecedented situation.  On March 19, 2020, the Board of Directors conferred with the Debtors' management team and advisors regarding their options.  Thereafter, the Board of Directors, in a sound exercise of its fiduciary duties, directed the Debtors to draw down an amount under the RBL Facility sufficient to ensure that the Debtors had more than adequate liquidity to operate through 2020.  That same day, the Debtors retained Alvarez & Marsal North America, LLC ("A&M") as restructuring advisor to assist with liquidity management.

10.      On March 23, 2020, the Debtors drew down $650 million from the RBL Facility. Immediately thereafter, the Debtors commenced discussions with the RBL Lenders regarding the Debtors' anticipated path forward.  The Debtors also engaged with an ad hoc group of the Debtors' unsecured noteholders (the "Ad Hoc Group") represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP, as legal counsel, and PJT Partners, LP, as financial advisor.  The Debtors' discussions with the RBL Lenders and the Ad Hoc Group included whether to pay off the 2020 convertible notes (which were trading between 50 and 70 cents following the March 9 oil price collapse) at maturity on April 1, 2020, which the Ad Hoc Group informed the Debtors in writing its members strongly opposed, in favor of a comprehensive restructuring premised on a debt-for-equity swap that would leave the holders of the Debtors' convertible notes and senior unsecured notes with substantially all of Whiting's equity.

11.      The Debtors and the Ad Hoc Group also began to engage regarding a potential comprehensive restructuring transaction.  To facilitate these discussions, several members of the Ad Hoc Group became restricted under confidentiality agreements and the Debtors provided

requested diligence to the Ad Hoc Group and its advisors.  The Debtors and the Ad Hoc Group ultimately exchanged numerous term sheets regarding a consensual debt-for-equity exchange to be implemented pursuant to a prearranged chapter 11 plan of reorganization.

12.     In response, Whiting's Board of Directors focused on whether to pay the 2020 convertible notes at maturity on April 1, 2020.  The Board of Directors evaluated, among other things, the Debtors' ability to satisfy in full roughly $2.2 billion in unsecured note maturities between late 2020 and 2026, including nearly $775 million in December 2020 to avoid a springing maturity on the RBL Facility.  The Board of Directors also considered the possibility that the RBL Lenders may reduce the Debtors' borrowing base (which is set for redetermination each May 1 and November 1).  The Board of Directors believed that such a reduction might limit the Debtors' flexibility to use any remaining availability under the RBL Facility to satisfy their funded debt obligations.  Also relevant was the fact that the RBL Facility would mature at the end of 2020 absent the payment in full or refinancing of the 2021 notes.  Finally, the Board of Directors weighed the views of the Debtors' major funded debt stakeholders, which, as noted above, opposed paying off the convertible notes and instead favored a comprehensive restructuring.  Ultimately, the Board of Directors, in a sound exercise of its fiduciary duties and upon the advice of the Debtors' advisors, elected to forego the $190 million maturity payment on the convertible notes on April 1, 2020.

13.     In connection therewith, the Debtors reached an agreement in principle with the restricted members of the Ad Hoc Group regarding a term sheet (the "Restructuring Term Sheet," which is attached hereto as **Exhibit A**) detailing the terms of a consensual restructuring of the Debtors' funded debt obligations through a chapter 11 plan of reorganization (the "Plan").  The Restructuring Term Sheet represents the cornerstone of the Debtors' restructuring efforts.  As of

the date hereof, the Debtors have not yet entered into a formal restructuring support agreement (an "RSA").  However, the Debtors currently anticipate that they will likely enter into an RSA with certain members of the Ad Hoc Group in the coming days, pursuant to which the Debtors and the Ad Hoc Group would agree to pursue the restructuring contemplated by the Restructuring Term Sheet (such signatories to the RSA, the "Consenting Creditors").  The RSA, once finalized, will empower the Debtors to promptly file, prosecute, and confirm the Plan and expeditiously exit from chapter 11 thereafter.  The principal terms of the Restructuring Term Sheet are as follows:

- ***Treatment of RBL Facility Claims.***  The holders of obligations under the RBL Facility would have such obligations refinanced or repaid in full in cash upon the Debtors' emergence from chapter 11.

- ***Treatment of Convertible Notes and Senior Notes.***  The holders of the Debtors' convertible notes and senior unsecured notes would receive 97% of the Debtors' reorganized equity interests.  The Debtors and the Consenting Creditors will continue to discuss whether any new debt should also be issued by the reorganized Debtors to holders of the Debtors' convertible notes and senior notes depending on market conditions.

- ***Trade and Other Claims.***  The Debtors' other secured, priority, and general unsecured[3] claims will ride through the bankruptcy and receive payment in full in cash following emergence.

- ***Existing Equity Holders.***  The holders of the Debtors' existing equity would receive (a) 3% of the Debtors' reorganized equity interests, (b) warrants to purchase 10% of the Debtors' reorganized equity interests at an implied 110% recovery to holders of the Debtors' convertible notes and senior unsecured notes at any time prior to 4 years after the consummation of the Plan, and (c) warrants to purchase 5% of the Debtors' reorganized equity interests at an implied 125% recovery to holders of the Debtors' convertible notes and senior notes at any time prior to 5 years after the consummation of the Plan.

- ***Releases, Exculpation.***  The Plan contemplated by the RSA would contain typical and customary releases by the Debtors and third parties and exculpation provisions.

14.     To effectuate the foregoing, on the date hereof, the Debtors commenced cases in this Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  To

---

[3]     The treatment of general unsecured claims remains the subject of ongoing negotiations between the Debtors and the Consenting Creditors.

familiarize the Court with the Debtors and their enterprise, I submit this Declaration.  This Declaration is organized into three sections.  *Part I* provides a general overview of the upstream industry and the Debtors' business, corporate history, and corporate structure.[4]  *Part II* details the Debtors' prepetition capital structure.  Finally, *Part III* describes the Debtors' prepetition restructuring efforts, the events and circumstances leading to the filing of these chapter 11 cases, and proposed timeline for these chapter 11 cases.

**Part I:
General Background**

**A.      The Debtors' Corporate History.**

15.      The Debtors operate an independent exploration and production ("E&P") company with an oil-focused asset base.  The Debtors' primary production and development activities are located in North Dakota and the Rocky Mountain region, with additional oil and gas properties located in Texas.  The Debtors' assets predominately are mature properties with stable, high-quality, oil-weighted production.  Headquartered in Denver, Colorado, the Debtors have approximately 500 employees.  The Debtors' operating revenue for the twelve-month period that ended December 31, 2019 was approximately $1.6 billion, and, as of the Petition Date, the Debtors have approximately $3.4 billion in total funded debt obligations.

16.      Whiting was founded in January 1980 in Denver, Colorado by Kenneth R. Whiting and Bert Ladd.  Mr. Whiting served as President and Chief Executive Officer until 1993 and as a director until 2008.  In 1983, Whiting merged with Keba Oil & Gas and Hingeline-Overthrust to become a public company.  In 1992, Alliant Energy, a Midwest public utility, acquired Whiting as

---

4      Many of the financial figures presented in this Declaration are unaudited and potentially subject to change, but reflect the Debtors' most recent review of their businesses.  The Debtors reserve all rights to revise and supplement the figures presented herein.

a wholly-owned subsidiary.  In November 2003, Whiting again became a public company as part of its initial public offering on the New York Stock Exchange ("NYSE").

17.     As of the Petition Date, the Debtors control one of the largest acreage positions in the Bakken and Three Forks resource play in the Williston Basin of North Dakota and Montana (the "Williston Basin"), with 471,000 net acres in the oil-productive "sweet spots" of the basin. From the Bakken and Three Forks resource play, the Debtors have consistently been a top oil producer in North Dakota.  The Debtors also own 86,000 net acres in the eastern Denver-Julesburg Basin of Colorado (the "DJ Basin").  As of December 31, 2019, the Debtors' estimated proved reserves totaled approximately 485.4 million stock tank barrels of oil equivalent ("BOEs"). The Debtors' 2019 average daily production was 125,500 BOE per day, resulting in an average reserve life of approximately 10.6 years.

18.     The Debtors, like many of their industry peers, experienced significant challenges over the past several years due to sustained downturns and volatility in commodities markets.  Such challenges have been exacerbated in recent weeks by the unprecedented drop in global energy prices and market uncertainty due to the combined effects of the COVID-19 pandemic and tensions between OPEC and Russia.

19.     Whiting's common stock trades on the NYSE under the symbol WLL.  A simplified version of the Debtors' current corporate structure is as follows:





### B.  The Debtors' Assets and Operations.

#### 1.  The Debtors' Business Strategy.

20.     Since their inception, the Debtors have built a strong asset base through a combination of property acquisitions and development of proved reserves and exploration activities.  The Debtors' current operations and capital programs focus on organic drilling opportunities and the development of previously acquired properties.  In particular, the Debtors focus on projects they believe will provide the greatest potential for repeatable success and production growth.  At the same time, the Debtors selectively pursue acquisitions that complement their existing core properties, including other basins where they can apply their existing knowledge and expertise to build production and add proved reserves.

#### 2.  Acquisitions and Divestitures.

21.     As a result of lower crude oil prices during 2017 and 2018, the Debtors significantly reduced their level of capital spending and focused their drilling activities on projects they determined would provide the highest rate of return.  During 2019, the Debtors focused on developing their large resource play in the Williston Basin while continuing to closely align their capital spending with cash flows generated from operations.  The Debtors continually evaluate their property portfolio and sell properties when the Debtors believe that the sales price realized will provide an above-average rate of return for the property or when the property no longer matches the profile of properties the Debtors desire to own.

22.     The Debtors' recent acquisitions and divestitures are described below:

a.  **2018 Acquisitions and Divestitures.**   In July 2018, the Debtors completed the acquisition of approximately 54,800 net acres in the Williston Basin, including interests in 117 producing oil and gas wells and undeveloped acreage located in Richland County, Montana and McKenzie County, North Dakota, for an aggregate purchase price of $130 million (before closing adjustments).   The producing properties had estimated proved reserves of 25.7 million BOE as of the acquisition date, 84% of which was crude oil and natural gas liquids.   The Debtors did not have any significant divestitures during the year ended December 31, 2018.

b.  **2019 Acquisitions and Divestitures.**   In July 2019, the Debtors completed the divestiture of their interests in 137 non-operated, producing oil and gas wells located in McKenzie, Mountrail, and Williams counties of North Dakota for aggregate sales proceeds of $27 million (before closing adjustments).   In August 2019, the Debtors completed the divestiture of their interests in 58 non-operated, producing oil and gas wells located in Richland County, Montana and Mountrail and Williams counties of North Dakota for aggregate sales proceeds of $26 million (before closing adjustments).   On a combined basis, the divested properties consisted of less than 1% of the Debtors' estimated proved reserves as of December 31, 2018 and the Debtors' April 2019 average daily production.

c.  **Recent Acquisitions and Divestitures.**   Subsequent to December 31, 2019, the Debtors completed the divestiture of their interests in 30 non-operated, producing oil and gas wells and related undeveloped acreage located in McKenzie County, North Dakota for aggregate sales proceeds of $25 million (before closing adjustments). The divested properties consisted of less than 1% of the Debtors' estimated proved reserves as of December 31, 2019 and 1% of the Debtors' average daily production for the year ended December 31, 2019.   There were no significant acquisitions during the year ended December 31, 2019.

3.      **The Debtors' Geography.**

     a.   ***Rocky Mountains and North Dakota.***

i.      The Debtors' Northern Rocky Mountains operations include properties in the Williston Basin targeting the Bakken and Three Forks formations and encompassing approximately 471,000 gross developed and undeveloped acres.

ii.     The Debtors' Central Rocky Mountains operations include properties at their Redtail field in the DJ Basin targeting the Niobrara and Codell and Fort Hays formations and encompassing approximately 86,000 gross developed and undeveloped acres.



b. ***Other Regions.***  Outside of the Rocky Mountains, the Debtors have assets in several states including in the Permian basin of West Texas and the Gulf Coast.



4.      **The Debtors' Operations.**

C.      **The Debtors' Industry.**

23.      The majority of the Debtors' assets are in the upstream sector of the oil and gas industry, which is comprised of E&P activities that focus on locating and extracting crude oil, raw natural gas, and other hydrocarbons from under the ground.  Common upstream assets include wells and simple well pad equipment.  The Debtors focus on the acquisition, exploration, development, and production of crude oil, natural gas liquids, and natural gas.  Although the Debtors also engage in certain functions such as gathering, processing, and marketing—which are typically characterized as mid-stream or downstream activities—the Debtors consider such functions to be ancillary to their upstream E&P activities.

D.      **Marketing, Major Customers, and Delivery Commitments.**

24.      The Debtors principally sell their oil and gas production to end users, marketers, and other purchasers that have access to nearby pipeline or rail takeaway.  In areas where there is no practical access to gathering pipelines, oil is trucked or transported to terminals, market hubs, refineries or storage facilities.  The table below presents percentages by purchasers that accounted for 10% or more of the Debtors' total oil, natural gas liquid, and natural gas sales for the years ended December 31, 2019, 2018, and 2017:

| **Year Ended December 31, 2019** | |
| --- | --- |
| Tesoro Crude Oil Co. | 14% |
| Phillips 66 Company | 12% |
| **Year Ended December 31, 2018** | |
| United Energy Trading, LLC | 17% |
| Tesoro Crude Oil Co. | 14% |

| | |
|---|---|
| Phillips 66 Company | 11% |
| **Year Ended December 31, 2017** | |
| Tesoro Crude Oil Co. | 18% |

25.     The Debtors maintain production sales agreements containing customary terms and conditions for the oil and natural gas industry, and which generally provide for sales based on prevailing market prices in the area.  These production sales agreements generally have terms of one year or less.

26.     As of December 31, 2019, the Debtors were parties to three physical delivery contracts requiring them to deliver fixed volumes of crude oil.  One of these contracts is tied to crude oil production from the Williston Basin and requires delivery of 10,000 barrels per day for a term of seven years.  The effective date of this agreement is contingent upon the completion of certain related pipelines, which are currently expected to be brought online in 2021.  Under the terms of this agreement, if the Debtors fail to deliver the committed volumes, they will be required to pay a deficiency payment of $5.75 per undelivered barrel, subject to upward adjustment, over the duration of the contract.

27.     The Debtors' two remaining physical delivery contracts are effective as of December 31, 2019.  One of these contracts is tied to oil production at the Debtors' Sanish field in Mountrail County, North Dakota and is effective for a term of seven years ending May 31, 2024. The other contract is tied to oil production at the Debtors' Redtail field in Weld County, Colorado and terminates in April 2020. The following table summarizes the Debtors' Sanish and Redtail delivery commitments as of December 31, 2019:

| Period | Sanish Contracted Crude Oil Volumes (Bbl) | Redtail Contracted Crude Oil Volumes (Bbl) | As a Percentage of Total 2019 Oil Production |
|---|---|---|---|
| January to December 2020 | 5,490,000 | 4,140,000 | 32% |
| January to December 2021 | 5,475,000 | — | 18% |
| January to December 2022 | 5,475,000 | — | 18% |
| January to December 2023 | 5,475,000 | — | 18% |
| January to December 2024 | 2,280,000 | — | 8% |

E.      **Hedge Portfolio.**

28.     To provide protection against volatility in commodity prices, the Debtors have historically entered into hedging transactions of their oil and natural gas production revenues to reduce their exposure to fluctuations in the price of oil and natural gas.  The Debtors' hedging transactions to date have consisted of financially-settled crude oil and natural gas options contracts—primarily costless collars and swaps—placed with major financial institutions.  As of February 20, 2020, the Debtors had contracts covering the sale of 31 million barrels of oil per day for the remainder of 2020 and 6 million barrels of oil per day for all of 2021.  As of March 31, 2020, current mark-to-market value of the Company's hedge contracts is estimated to be approximately $216.7 million.  All of the Debtors' oil hedges will expire by December 2021.

**Part II:**
**The Debtors' Prepetition Capital Structure**

29.     As of the Petition Date, the Debtors had approximately $3.4 billion in total funded debt obligations.  The relative priorities of each debt obligation are as follows:

| Debt | Approx. Principal Amount Outstanding |
|---|---|
| RBL Facility | $1.072 billion |
| **Total Secured Debt** | **$1.072 billion** |
| 1.25% Convertible Senior Notes due 2020 | $189.1 million |
| 5.75% Senior Notes due 2021 | $773.6 million |
| 6.25% Senior Notes due 2023 | $408.3 million |
| 6.625% Senior Notes due 2026 | $1.000 billion |
| **Total Unsecured Notes** | **$2.371 billion** |
| **Total Funded Debt Obligations** | **$3.443 billion** |

A.     **The RBL Facility.**

30.     On April 12, 2018, the Debtors entered into that certain Seventh Amended and Restated Credit Agreement, by and among Whiting Oil and Gas Corporation, as borrower, Whiting, as parent guarantor, the lenders party thereto from time to time (the "RBL Lenders"), and JPMorgan Chase Bank, N.A., as the administrative agent (as amended, supplemented, or modified from time to time in accordance with the terms therein, the "Credit Agreement"), which provides for the Debtors' reserve-based lending facility (the "RBL Facility").  Pursuant to a certain Second Amended and Restated Guaranty and Collateral Agreement, the RBL Facility is guaranteed by each of the Debtors and is secured on a first-priority basis by substantially all of the assets and stock of the Debtors.  The borrowing base of the RBL Facility is $2.05 billion and the aggregate commitments are $1.75 billion.

31.     The maturity date of the RBL Facility is April 12, 2023, subject to a springing maturity on December 15, 2020 if the 2021 Senior Notes (as defined below) are not paid in full prior to such date.   The RBL Facility accrues interest at a rate per annum equal to:   (a) the alternative base rate plus an applicable margin of 0.5% - 1.5% based on the borrowing base utilization percentage; or (b) adjusted LIBOR plus an applicable margin of 1.5% - 2.5% based on the borrowing base utilization percentage.

32.     The borrowing base under the RBL Facility is subject to redeterminations from time to time.   In October 2019, the borrowing base under the RBL Facility was reduced from $2.25 billion to $2.05 billion in connection with the November 1, 2019, regular borrowing base redetermination, with no change to the aggregate commitments of $1.75 billion.

33.     As of the Petition Date, approximately $1.072 billion is outstanding under the RBL Facility.   Additionally, as of the Petition Date, there are approximately $2.0 million in letters of credit as issued but undrawn under the RBL Facility.

34.     Additionally, pursuant to the terms of the RBL Facility, the Debtors enter into and perform under certain hedging arrangements (the "Hedging Arrangements") to mitigate risks related to commodity price and interest rate fluctuations.   As of the Petition Date, the Debtors are party to Hedging Arrangements with nine hedging counterparties (individually, a "Hedge Counterparty," and, collectively, the "Hedge Counterparties").   While historically the Hedge Counterparties have consisted of both RBL Lenders or their affiliates, as well as non-RBL Lenders or affiliates, as of the Petition Date, each of the Hedge Counterparties is an RBL Lender or affiliate thereof.   To the extent that a Hedge Counterparty is an RBL Lender or an affiliate thereof, all obligations under such Hedging Arrangements are secured by the same collateral that secures the

RBL Facility.   As of the Petition Date, the Hedging Arrangements have an aggregate mark-to-market value of approximately $216.7 million (in amounts due to the Debtors).[5]

**B.   2020 Convertible Senior Notes.**

35.   In connection with entry into that certain indenture, dated as of March 27, 2015 (as amended, supplemented, or modified from time to time in accordance with the terms therein, the "2020 Convertible Senior Notes Indenture"), by and among Whiting, as issuer, certain guarantors party thereto, and Bank of New York Mellon Trust Company, N.A., as trustee, the Debtors issued a series of 1.25% convertible senior notes due 2020 (the "2020 Convertible Senior Notes") in an aggregate principal amount of $688 million.

36.   The 2020 Convertible Senior Notes bear interest at a rate of 1.25% per annum, with interest payable on April 1 and October 1 of each year, beginning on October 1, 2016.  The 2020 Convertible Senior Notes mature on April 1, 2020.   As of the Petition Date, approximately $189.1 million is outstanding under the 2020 Convertible Senior Notes.

**C.   2021 Senior Notes.**

37.   In connection with entry into that certain second supplemental indenture, dated as of September 12, 2013 (the "2021 Senior Notes Indenture") to that certain senior indenture dated as of September 12, 2013 (the "Base Indenture"), by and among Whiting, as issuer, each of the remaining Debtor entities, as guarantors, and Bank of New York Mellon Trust Company, N.A., as trustee, Whiting issued a series of 5.75% senior notes due 2021 (the "2021 Senior Notes") in an aggregate principal amount of $800 million.

38.   The 2021 Senior Notes bear interest at a rate of 5.75% per annum.  Interest is payable on the 2021 Senior Notes on March 15 and September 15 of each year, beginning on

---

[5]   Calculated as of March 30, 2020.

March 15, 2014.  The 2021 Senior Notes mature on March 15, 2021.  As of the Petition Date, approximately $773.6 million is outstanding under the 2021 Senior Notes.

**D.      2023 Senior Notes.**

39.      In connection with entry into that certain fourth supplemental indenture, dated as of March 27, 2015 (the "2023 Senior Notes Indenture") to the Base Indenture, by and among Whiting, as issuer, each of the remaining Debtor entities, as guarantors, and Bank of New York Mellon Trust Company, N.A., as trustee, Whiting issued a series of 6.25% senior notes due 2023 (the "2023 Senior Notes") in an aggregate principal amount of $750 million.

40.      The 2023 Senior Notes bear interest at a rate of 6.25% per annum.  Interest is payable on the 2023 Senior Notes on April 1 and October 1 of each year, beginning on October 1, 2015.  The 2023 Senior Notes mature on April 1, 2023.  As of the Petition Date, approximately $408.3 million is outstanding under the 2023 Senior Notes.

**E.      2026 Senior Notes.**

41.      In connection with entry into that certain fifth supplemental indenture, dated as of December 27, 2017 (the "2026 Senior Notes Indenture") to the Base Indenture, by and among Whiting, as issuer, each of the remaining Debtor entities, as guarantors, and Bank of New York Mellon Trust Company, N.A., as trustee, Whiting issued a series of 6.625% senior notes due 2026 (the "2026 Senior Notes") in an aggregate principal amount of $1.0 billion.

42.      The 2026 Senior Notes bear interest at a rate of 6.625% per annum.  Interest is payable on the 2026 Senior Notes on January 15 and July 15 of each year, beginning on July 15, 2018.  The 2026 Senior Notes mature on January 15, 2026.  As of the Petition Date, approximately $1.0 billion is outstanding under the 2026 Senior Notes.

**F.      Equity.**

43.      As of December 31, 2019, Whiting had approximately 91,326,469 shares of common stock outstanding.  As of February 20, 2020, there were 444 holders of record of WLL common stock.

44.      Since August, 2014, the trading price of WLL common stock has faced downward pressures proportionate with downturns in commodity markets as depicted below.



45.      On November 8, 2017, Whiting's Board of Directors approved a reverse stock split of the company's common stock at a ratio of one-for-four and a reduction in the number of authorized shares of the company's common stock from 600,000,000 shares to 225,000,000. Whiting's common stock began trading on a split-adjusted basis on November 9, 2017, upon opening of the markets.

46.      The following graph compares, on a cumulative basis, changes since December 31, 2014, in the total stockholder return on Whiting common stock with the total return on the Standard & Poor's Composite 500 Index, and the total return on the Dow Jones U.S. Exploration & Production Index.  Such changes have been measured by dividing (a) the sum of (i) the cumulative amount of dividends for the measurement period, assuming dividend

reinvestment, and (ii) the difference between the price per share at the end of and the beginning of the measurement period, by (b) the price per share at the beginning of the measurement period. The graph assumes $100 was invested on December 31, 2014, in Whiting common stock, the Standard & Poor's Composite 500 Index and the Dow Jones U.S. Exploration & Production Index, respectively.



| | 12/31/2014 | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 |
|---|---|---|---|---|---|---|
| Whiting Petroleum Corporation | $ 100 | $ 29 | $ 36 | $ 20 | $ 17 | $ 6 |
| Standard & Poor's Composite 500 Index | 100 | 99 | 109 | 130 | 122 | 157 |
| Dow Jones U.S. Exploration & Production Index | 100 | 75 | 92 | 91 | 74 | 91 |

**Part III:**
**Events Leading to These Chapter 11 Cases**

A.      **Early 2020: Evaluation of Liability Management Transactions.**

47.      As described above, prior to the March 2020 global collapse of oil prices, the Debtors were focused on evaluating various transactions that could right-size their assets and capital structure and set the Debtors on a path for long-term success.  As late as February 2020, the Debtors were evaluating potential merger and acquisition, sale, and consensual recapitalization options that would allow them to address their significant funded indebtedness, especially the senior unsecured note maturities in 2021, 2023, and 2026 that totaled $2.2 billion.  However, the Debtors were unable to reach an agreement on any potential liability management transaction at that time.  Nevertheless, at that time, the Debtors expected to draw down on their availability under the RBL Facility and utilize this cash to pay the $190 million maturity payment of the 2020 convertible notes that was due on April 1, 2020.  Thereafter, the Debtors planned to organize their senior unsecured noteholders to negotiate a liability management transaction, ahead of the maturity payment on the 2021 senior unsecured notes, which would right-size the Debtors' balance sheet and allow them to make their bond maturity payments in 2021, 2023, and 2026.

B.      **Recent Market Volatility and March 2020 Oil Market Crash.**

48.      The Debtors' plans to pay the $190 million maturity payment of the convertible notes on April 1, 2020 were completely upended by the sudden crash of oil prices in March. Historically, markets for oil, natural gas, and natural gas liquid have been volatile.  This volatility, however, has been exacerbated by the sudden, combined impact of the COVID-19 pandemic and the oil price war between the Kingdom of Saudi Arabia and Russia.  This volatility has not only had a negative impact on commodity markets, but financial markets in general.

49.     In early 2020, the initial spread of COVID-19 caused decreased factory output and transportation demand, resulting in a decline in energy prices.  To address this, OPEC, led by the Kingdom of Saudi Arabia, called for additional cuts in oil production, subject to agreement by Russia.  However, those efforts faltered, and the parties failed to reach an agreement as to production levels.  In the aftermath, both the Kingdom of Saudi Arabia and Russia announced that they would *increase*, rather than decrease production, resulting in surplus supply amidst already decreasing demand for energy.  Meanwhile, the COVID-19 pandemic continued (and continues) to spread at alarming rates causing governments across the world to institute drastic measures that have decreased energy demand even further.

50.     The effects on energy markets have been stark.  In March 2020, oil prices plummeted to near $20 per barrel, the lowest point in nearly twenty years.  The effect on all companies in the oil and gas industry (not just E&P companies) has been undeniable.  However, independent oil and gas companies such as Whiting have been especially hard-hit, as their revenues primarily are generated from the sale of unrefined oil, natural gas, and natural gas liquids.

51.     The current volatility in commodity markets has made it especially difficult for some companies to execute on out-of-court restructuring alternatives.  In the first three months of 2020, at least nine large E&P companies and related service providers have filed for chapter 11, including Kingfisher Midstream, LLC on January 13, 2020; McDermott International, Inc. on January 21, 2020; Southland Royalty Company, LLC on January 27, 2020; Foresight Energy LP on March 10, 2020; and Pioneer Energy Services Corporation on March 1, 2020.

C.     **Negotiations with Key Creditors; Proposed Timeline of These Chapter 11 Cases.**

52.     As described above, following the sudden crash of oil prices in March 2020, the Debtors and their advisors immediately revised their prior plans to pursue an out-of-court liability management transaction later in 2020, and instead evaluated whether it was still appropriate to pay the $190 million maturity payment due on the 2020 convertible notes. *First*, the Debtors, with the input of their advisors, decided to draw down $650 million on the RBL Facility to provide the Debtors with more than enough liquidity to operate throughout the remainder of 2020. *Second*, following the draw-down, the Debtors engaged with their banks and the Ad Hoc Group regarding the terms of the consensual use of cash collateral and a potential restructuring premised on a debt-for-equity exchange of the Debtors' convertible notes and senior unsecured notes. Both the banks and the Ad Hoc Group were supportive of a potential restructuring, and indicated their strong preference that the Debtors not make the maturity payment due on April 1, 2020.

53.     As described further above, in late March 2020, Whiting's Board of Directors determined, in a sound exercise of their fiduciary duties, to forego the $190 million maturity payment in light of, among other things the Debtors' liquidity and financial condition (in particular, the Debtors' ability to make the $2.0 billion in maturity payments due in 2021, 2023, and 2026), and the opposition by the Debtors' key stakeholders to such payment.

54.     The Debtors were able to rapidly negotiate the terms of the consensual use of cash collateral with the banks under the RBL Facility, which the Debtors expect will provide more than enough liquidity for the Debtors to operate through the projected timeline of these chapter 11 cases without the need for incremental postpetition "DIP" financing.

55.     At the same time, the Debtors immediately began arm's-length negotiations with the Ad Hoc Group regarding the terms of a holistic restructuring sponsored by the Ad Hoc Group.

Certain large holders of the Debtors' notes executed confidentiality agreements to permit the exchange of diligence.  Immediately prior to the filing of these Chapter 11 Cases, the Debtors reached an agreement in principle with the restricted members of the Ad Hoc Group regarding the Restructuring Term Sheet, which serves as the backbone of the Debtors' restructuring pursuant to the Plan.  A summary of the treatment that would be provided to the Debtors' stakeholders under the Plan contemplated by the Restructuring Term Sheet is as follows:[6]

| Stakeholder | Treatment |
|---|---|
| Administrative Claims | Paid in full in cash on emergence |
| RBL Facility Claims | Paid in full in cash with the proceeds of an exit facility or the Debtors' cash on hand |
| Other Secured Claims | Treatment rendering such claims unimpaired pursuant to section 1124 of the Bankruptcy Code |
| Other Priority Claims | Treatment rendering such claims unimpaired pursuant to section 1124 of the Bankruptcy Code |
| Senior Notes Claims | 97% of the equity of the reorganized Debtors.  The Debtors and the Consenting Creditors will discuss whether new debt should be issued by the reorganized Debtors to the holders of Senior Notes Claims based on market conditions |
| Trade Vendor and Other General Unsecured Claims | Treatment rendering such claims unimpaired pursuant to section 1124 of the Bankruptcy Code (subject to continued negotiations and discussions between the Debtors and the Consenting Creditors) |
| Existing Equity Interests | (a) 3% of the equity of the reorganized Debtors, (b) warrants to purchase 10% of the Debtors' reorganized equity interests at an implied 110% recovery to holders of the Debtors' convertible notes and senior unsecured notes at any time prior to 4 years |

---

[6]   Defined terms in the below table have the meanings ascribed to such terms in the Restructuring Term Sheet.  To the extent there is any discrepancy between the summary below and the Restructuring Term Sheet, the Restructuring Term Sheet shall control.

| | after the consummation of the Plan, and (c) warrants to purchase 5% of the Debtors' reorganized equity interests at an implied 125% recovery to holders of the Debtors' convertible notes and senior notes at any time prior to 5 years after the consummation of the Plan. |
|---|---|

56.     The Debtors anticipate that in the coming days they will finalize and enter into an RSA with the Consenting Creditors.  Thereafter, the Debtors intend to rapidly proceed with the Plan contemplated by the RSA and Restructuring Term Sheet in order to effectuate this agreed-upon balance sheet restructuring and facilitate their prompt emergence from chapter 11.

57.     The Debtors look forward to continuing to engage with their stakeholders (including any statutory committees) following the Petition Date to build consensus for the RSA and the Plan and move rapidly towards confirmation of a largely-consensual financial restructuring that will right-size the Debtors' balance sheet and position the reorganized Debtors for long-term success.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  April 1, 2020

*/s/ Jeffrey S. Stein*
Jeffrey S. Stein
Chief Restructuring Officer
Whiting Petroleum Corporation

## **Certificate of Service**

I certify that on April 1, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Matthew D. Cavenaugh
Matthew D. Cavenaugh

## Exhibit A

**Restructuring Term Sheet**

PROPOSED EXECUTION COPY

# WHITING PETROLEUM CORPORATION

## RESTRUCTURING TERM SHEET

### April 1, 2020

This restructuring term sheet (this "**Term Sheet**") presents the principal terms of a proposed financial restructuring (the "**Restructuring**") of the existing indebtedness of Whiting Petroleum Corporation ("**Parent**") and its subsidiaries that are identified below (collectively, the "**Company**" or the "**Debtors**"), which Restructuring will be consummated by commencing prearranged cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") to pursue a chapter 11 plan of reorganization containing the terms set forth herein. This is the Term Sheet referred to in, and appended to, the Restructuring Support Agreement dated as of April 1, 2020, by and among the Company and the other parties signatory thereto (as amended, supplemented, or otherwise modified from time to time, the "**RSA**"). Capitalized terms used but not otherwise defined herein will have the meanings ascribed to such terms in **Annex 1**.

> **THIS TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH AN OFFER, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.**

**THIS TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN (OTHER THAN THE RSA). THE CLOSING OF ANY TRANSACTION WILL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.**

| OVERVIEW | |
|---|---|
| **Company:** | Parent, Whiting Oil and Gas Corporation, Whiting US Holding Company, Whiting Canadian Holding Company Unlimited Liability Corporation, and Whiting Resources Corporation (collectively, the "***Company***" or the "***Debtors***"). |
| **Proposed Filing Date and Venue:** | No later than April 1, 2020 (the "***Petition Date***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***"). |
| **Claims and Interests to be Restructured:** | Revolving Credit Agreement Claims: consisting of up to $1.072 billion in principal amount, including reimbursement obligations in respect of letters of credit, plus accrued and unpaid interest (at the non-default rate), fees, and other expenses arising and payable under that certain Seventh Amended and Restated Credit Agreement, dated as of April 12, 2018 (as amended, modified, or otherwise supplemented from time to time, the "***Revolving Credit Agreement***"), by and among Whiting Oil and Gas Corporation, as borrower, Whiting Petroleum Corporation, as parent guarantor, JPMorgan Chase Bank, N.A., as administrative agent (the "***Revolving Credit Agreement Agent***"), and the lenders thereunder (together with the other Secured Parties (as defined therein), the "***Revolving Credit Agreement Lenders***") (the Claims thereunder, the "***Revolving Credit Agreement Claims***") party thereto from time to time. |
| | Senior Notes Claims: Approximately $2.371 billion in aggregate principal amount, consisting of: |
| | **(i)** approximately $774 million in principal amount, plus accrued and unpaid interest, fees, and other expenses arising and payable pursuant to the 5.750% Senior Notes due 2021 (the "***2021 Senior Notes***," and the holders thereof, the "***2021 Senior Noteholders***") or that certain indenture, dated as of September 12, 2013 (as amended, modified, or otherwise supplemented from time to time, the "***2021 Senior Notes Indenture***," and the Claims thereunder, the "***2021 Senior Notes Claims***"), under which the 2021 Senior Notes were issued by and among Parent, as issuer, each of the guarantors named therein, as guarantors, and The Bank of New York Mellon Trust Company, N.A., as indenture trustee; |
| | **(ii)** approximately $408 million in principal amount, plus accrued and unpaid interest, fees, and other expenses arising and payable pursuant to the 6.250% Senior Notes due 2023 (the "***2023 Senior Notes***," and the holders thereof, the "***2023 Senior Noteholders***") or that certain indenture, dated as of March 27, 2015 (as amended, modified, or otherwise supplemented from time to time, the "***2023 Senior Notes Indenture***," and the Claims thereunder, the "***2023 Senior Notes Claims***"), under which the 2023 Senior |

2

Notes were issued by and among Parent, as issuer, each of the guarantors named therein, as guarantors, and The Bank of New York Mellon Trust Company, N.A., as indenture trustee;

**(iii)** approximately $1 billion in principal amount, plus accrued and unpaid interest, fees, and other expenses arising and payable pursuant to the 6.625% Senior Notes due 2026 (the "*2026 Senior Notes*," and the holders thereof, the "*2026 Senior Noteholders*") or that certain indenture, dated as of December 27, 2017 (as amended, modified, or otherwise supplemented from time to time, the "*2026 Senior Notes Indenture*," and the Claims thereunder, the "*2026 Senior Notes Claims*"), under which the 2026 Senior Notes were issued by and among Parent, as issuer, each of the guarantors named therein, as guarantors, and The Bank of New York Mellon Trust Company, N.A., as indenture trustee; and

**(iv)** approximately $189 million in principal amount, plus accrued and unpaid interest, fees, and other expenses arising and payable pursuant to the 1.250% Convertible Senior Notes due 2020 (the "*Convertible Senior Notes*," and the holders thereof, the "*Convertible Senior Noteholders,*" and together with the 2021 Senior Noteholders, the 2023 Senior Noteholders and the 2026 Senior Noteholders, the "*Senior Noteholders*") or that certain indenture, dated as of March 27, 2015 (as amended, modified, or otherwise supplemented from time to time, the "*Convertible Senior Notes Indenture*," and the Claims thereunder, the "*Convertible Senior Notes Claims*," and together with the 2021 Senior Notes Claims, the 2023 Senior Notes Claims and the 2026 Senior Notes Claims, the "*Senior Notes Claims*"), under which the Convertible Senior Notes were issued by and among Parent, as issuer, each of the guarantors named therein, and The Bank of New York Mellon Trust Company, N.A., as indenture trustee (in its capacities as indenture trustee under the 2021 Senior Notes Indenture, the 2023 Senior Notes Indenture, the 2026 Senior Notes Indenture, and the Convertible Senior Notes Indenture, the "*Senior Notes Trustee*").

<u>General Unsecured Claims</u>:  consisting of any prepetition Claim against the Company that is not a Revolving Credit Agreement Claim, a Senior Notes Claim, an Intercompany Claim, or a Claim that is secured, subordinated, or entitled to priority under the Bankruptcy Code (the "*General Unsecured Claims*").

<u>Existing Equity Interests</u>: consisting of the shares of the class of common stock of Parent that existed immediately prior to the Effective Date.

<u>Other Equity Interests</u>: consisting of all Interests in Parent other than Existing Equity Interests.

| **TRANSACTION OVERVIEW** |
|---|

| **Overview of the Restructuring:** | The Restructuring will be implemented through prearranged Chapter 11 Cases by the Company to pursue confirmation of the Plan.  Votes on the |
|---|---|

| | |
|---|---|
| | Plan will be solicited from (i) holders of Senior Notes Claims and (ii) holders of Existing Equity Interests. |
| | As a component of the Restructuring, (i) each Senior Noteholder will receive its Pro Rata share of 97.0% of New Common Shares in exchange for its Pro Rata share of the aggregate amount due under the Senior Notes Claims and (ii) each holder of Existing Equity Interests will be offered its Pro Rata share of 3.0% of New Common Shares and the Warrants. |
| | As of the Effective Date, the Revolving Credit Agreement Claims, Senior Notes Claims, Existing Equity Interests, and Other Equity Interests will be cancelled, released, and extinguished and will be of no further force and effect. |
| **Use of Cash Collateral:** | The Restructuring will be financed by consensual use of cash collateral. |
| | The Consenting Creditors shall support any order approving the consensual use of cash collateral (whether interim or final); provided that the interim order shall be substantially in the form attached hereto as **Exhibit A** |
| **TREATMENT OF CLAIMS AND INTERESTS** ||
| **Administrative Expense Claims and Priority Tax Claims:** | Except to the extent that a holder of an Allowed Administrative Expense Claim or an Allowed Priority Tax Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim and an Allowed Priority Tax Claim will receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Claim on the Effective Date or as soon as practicable thereafter or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **Other Secured Claims:** | Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors (subject to the consent of the Requisite Creditors), (i) each such holder will receive payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter, (ii) such holder's Allowed Other Secured Claim will be reinstated, or (iii) such holder will receive such other treatment so as to render such holder's Allowed Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code. |
| | Unimpaired – Presumed to Accept. |
| **Other Priority Claims:** | Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim will, |

| | at the option of the Debtors or the Reorganized Debtors (subject to the consent of the Requisite Creditors), (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter. <br><br> Unimpaired – Presumed to Accept. |
|---|---|
| **Revolving Credit Agreement Claims:** <br><br> *Up to $1.072 billion in principal amount plus all other outstanding secured obligations thereunder* | The Proceeds of the Exit Facility (if any) and/or the Debtors' cash on hand shall be used to repay the Revolving Credit Agreement Claims in full in cash on the terms set forth therein. <br><br> Unimpaired – Presumed to Accept |
| **Senior Notes Claims:** <br><br> *$2.371 billion Allowed Claim* | On the Effective Date, each holder of an Allowed Senior Notes Claim will receive, in full and final satisfaction of such Allowed Senior Notes Claim, its (i) Pro Rata share of 97% of the total New Common Shares issued pursuant to the Plan on the Effective Date, subject to dilution by the Warrant Equity and the MIP Equity and (ii) Pro Rata share of take-back debt, if any.  The Debtors and Consenting Creditors agree to discuss whether and the extent to which take-back debt will be issued based on market conditions.  To the extent any such take-back debt is agreed to, there will be a proportional adjustment to the allocation of New Common Shares and Warrants to take into account the issuance of such take-back debt. <br><br> Impaired – Entitled to Vote. |
| **General Unsecured Claims:** | [Each holder of a General Unsecured Claim will be satisfied by payment in full in cash on the Effective Date or be reinstated.][1] <br><br> [Unimpaired – Presumed to Accept.] |
| **Existing Equity Interests:** | On the Effective Date, Existing Equity Interests will be cancelled, released, and extinguished and will be of no further force and effect. Each holder of Existing Equity Interests will receive such holder's Pro Rata share of (i) the Warrants provided pursuant to the Plan on the Effective Date, subject to dilution by the MIP Equity, and (ii) 3.0% of the total New Common Shares issued pursuant to the Plan on the Effective Date, subject to dilution by the Warrant Equity and the MIP Equity. <br><br> Impaired – Entitled to Vote. |

---

[1]     Subject to discussion and agreement between the Company and the Requisite Creditors.

| | |
|---|---|
| **Other Equity Interests:** | On the Effective Date, Other Equity Interests will be cancelled, released, and extinguished and will be of no further force and effect.<br><br>Impaired – Presumed to Reject. |
| **Intercompany Claims and Intercompany Interests:** | All Intercompany Claims and Intercompany Interests will be reinstated or modified as agreed by the Company and the Requisite Creditors.<br><br>Unimpaired – Presumed to Accept or Reject. |
| **GENERAL PROVISIONS** | |
| **Executory Contracts and Unexpired Leases:** | As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, unless such contract or lease (i) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, (iv) contains a change of control or similar provision that would be triggered by the Restructuring (unless such provision has been irrevocably waived) or (v) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts; *provided*, *however*, that the Requisite Creditors consent to such rejection, such consent not to be unreasonably withheld. |
| **Board of Directors:** | The Board of Directors will consist of (i) the Reorganized Debtors' chief executive officer and (ii) the other directors selected by the Requisite Creditors, whose identities shall be disclosed in the plan supplement (the "***New Board***"). |
| **Charter, By-Laws and Organizational Documents:** | The Amended Organizational Documents will become effective as of the Effective Date. |

| | |
|---|---|
| **Management Incentive Plan:** | The Plan will provide for the establishment of a post-emergence management incentive plan to be adopted by the New Board (the "***Management Incentive Plan***"), which will (i) include restricted stock units, options, New Common Shares, or other rights exercisable, exchangeable, or convertible into New Common Shares representing 8.0% of the New Common Shares on a fully diluted and fully distributed basis and assuming the exercise of all of the Warrants (the "***MIP Equity***") and (ii) include other terms and conditions customary for similar type equity plans. No less than 50% of the MIP Equity will be granted at emergence to management employees in the form of restricted stock units (or the economic equivalent), on other customary terms and conditions for similar type awards, and which shall vest ratably over three years with the breakdown between time and performance based awards being determined by the New Board. |
| **Severance Arrangements:** | The Plan will provide for the implementation at emergence of customary severance arrangements for executive officers and other employees on a basis no less favorable than those in existence on the date hereof or with current market practice for a publicly traded company the size and nature of the Company. |
| **KEIP/KERP:** | To the extent the Company decides to seek Bankruptcy Court approval of (a) a key employee incentive plan for insider employees (the "***KEIP***"), and/or (b) a key employee retention plan for key non-insider employees (the "***KERP***"), the Company shall seek approval of the Consenting Creditors with respect to the terms of such KEIP and/or KERP prior to filing motion(s) seeking approval of the KEIP and/or KERP. |
| **Treatment of all Notes, Instruments, Certificates and other Documents:** | On the Effective Date of the Plan, all notes, instruments, certificates evidencing debt of the Company and Interests in Parent will be treated as agreed among the Company and the Requisite Creditors. |
| **Vesting of Assets:** | On the Effective Date, pursuant to section 1141(b)-(c) of the Bankruptcy Code, all operating assets of the Company will vest in the Reorganized Debtors free and clear of all liens, Claims, and encumbrances, except as otherwise provided by the Plan. |
| **Survival of Indemnification Obligations and D&O Insurance:** | Any obligations of the Company pursuant to corporate charters, bylaws, limited liability company agreements, or other organizational documents to indemnify current and former officers, directors, managers, members, agents, or employees with respect to all present and future actions, suits, and proceedings against the Company or such directors, officers, managers, members, agents, or employees, based upon any act or omission for or on behalf of the Company will not be discharged or impaired by confirmation of the Plan. All such obligations will be assumed by the Company under |

|  | the Plan (and shall be treated as executory contracts to be assumed under the Plan, to the extent applicable) and will continue as obligations of the Reorganized Debtors.  Any Claim based on the Company's obligations thereunder will be an Allowed Claim.

In addition, after the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date. |
|---|---|
| **Conditions to Effectiveness:** | Effectiveness of the Plan will be subject to the satisfaction of customary conditions, including the following (as applicable):

   i.    the Definitive Documents (as defined in the RSA) will contain terms and conditions consistent in all material respects with this Term Sheet and the RSA;

  ii.    the Bankruptcy Court will have entered the Confirmation Order, and such Confirmation Order will not have been stayed or modified;

 iii.    to the extent an Exit Facility is entered into, the Exit Facility, including all documentation related thereto, will have been consummated;

 iv.    other conditions to be agreed among the Debtors and the Requisite Creditors

  v.    all governmental approvals, including Bankruptcy Court approval, necessary to effectuate the Restructuring will have been obtained and all applicable waiting periods will have expired; and

 vi.    all Restructuring Expenses will have been paid in full.

The conditions to effectiveness may be waived, in whole or in part, in writing (which may be via e-mail) by the Debtors and the Requisite Creditors. |
| **Releases by Debtors:** | The following Debtor release provision shall appear in the Plan, as may be modified by written agreement (which may be via e-mail) of the Debtors and the Requisite Creditors:

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in |

|  | each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof, including any draws under the Revolving Credit Facility), the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any avoidance actions, intercompany transactions between or among a Debtor or an affiliate of a Debtor and another Debtor or affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the plan supplement), or any aspect of the Restructuring, including any contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) any claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (iii) the rights of any current employee of the Debtors under any employment agreement or plan, (iv) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, or (v) the rights of Holders of Allowed Claims or Interests to receive distributions under the Plan. |
| **Releases by** | The following Releasing Party release provision shall appear in the Plan, as may be modified by written agreement (which may be via e-mail) of the |

| | |
|---|---|
| **Releasing Parties:** | Debtors and the Requisite Creditors: |
| | Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof, including any draws under the Revolving Credit Facility), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an affiliate of a Debtor and another Debtor or affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the plan supplement), or any aspect of the Restructuring, including any contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing. |
| | Notwithstanding anything contained herein to the contrary, the foregoing release does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) any claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (iii) the rights of any current employee of the Debtors under any employment agreement or plan, (iv) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, or (v) the rights of Holders of Allowed Claims or Interests to receive distributions under the Plan. |
| **Exculpation:** | The following exculpation provision shall appear in the Plan, as may be modified by written agreement (which may be via e-mail) of the Debtors and the Requisite Creditors: |

| | |
|---|---|
| | Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions (including any draws under the Revolving Credit Facility), the Disclosure Statement, the Plan, the plan supplement, or any transaction related to the Restructuring, any contract, instrument, release or other agreement or document created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, gross negligence or willful misconduct, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. |
| **Discharge and Injunction:** | The Plan will contain standard discharge and injunction provisions. |
| **Exemption from SEC Registration** | The issuance and distribution under the Plan of the (i) New Common Shares and (ii) Warrants will be issued in reliance on the exemption from registration under the Securities Act or applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code. |
| **Securities Issuance Requirements/ Registration Rights Agreement:** | The issuance of the New Common Shares will be subject to the following requirements (the "*Securities Issuance Requirements*"):<br><br>• the issuance of the New Common Shares under the Plan on the Effective Date will be made through the facilities of DTC in accordance with the customary practices of DTC for a mandatory distribution and the Reorganized Debtors will reflect ownership of the New Common Shares through the facilities of DTC; *provided, however*, that to the extent the New Common Shares are not eligible for distribution in accordance with DTC's customary practices, Reorganized Parent shall take all such reasonable actions as may be required to cause the distributions of the New Common Shares under this Plan, *provided*, *further*, *however*, that Holders of Existing Equity Interests that are entitled to receive New Common Shares (upon the exercise of their Warrants), but had held such Existing Equity Interests outside of the facilities of DTC, may receive their |

New Common Shares by means of book-entry with the Reorganized Debtor's transfer agent;

- no later than seven (7) calendar days prior to the Voting Deadline, the Debtors, with the consent of the Requisite Creditors, shall make a determination as to whether Reorganized Parent will continue to be a reporting company under the Exchange Act, 15 U.S.C. §§ 78(a) – 78(pp) following a date that is on or after the Effective Date (the "***Reporting Decision Date***") to be agreed upon by the Debtors and the Requisite Creditors.  If the Debtors, with the consent of the Requisite Creditors, determine that Reorganized Parent will continue to be a reporting company under the Exchange Act following the Reporting Decision Date, the Debtors shall use their commercially reasonable efforts to have the New Common Shares listed on the New York Stock Exchange, or another nationally recognized exchange, as soon as practicable following the Effective Date, subject to meeting applicable listing requirements.  If the Debtors determine pursuant to this provision that Reorganized Parent will not continue to be a reporting company under the Exchange Act following the Reporting Decision Date, the Debtors shall file a governance term sheet, in form and substance reasonably acceptable to the Company and the Requisite Creditors, with the plan supplement;

- the composition of the New Board will (i) if the Debtors, subject to the consent of the Consenting Creditors, determine that Reorganized Parent will continue to be a reporting company under the Exchange Act, comply in all respects with the rules applicable to the nationally recognized exchange on which the New Common Shares are to be listed (and the Requisite Creditors will agree to such modifications to the New Board as are necessary to comply with such requirements) or (ii) if the Debtors, subject to the consent of the Consenting Creditors, determine that Reorganized Parent will not continue to be a reporting company under the Exchange Act, be consistent with the governance term sheet referred to in the immediately preceding provision; and

- after the Effective Date, the sale or transfer of the New Common Shares will not be subject to any right of first refusal or right of first offer restrictions in favor of other holders of the New Common Shares.

Furthermore, on the Effective Date, the Reorganized Debtors, the Consenting Creditors and any holder of 10% or more of the New Common Shares will be party to a registration rights agreement providing for customary demand registration rights with respect to New Common Shares held by such Consenting Creditors and holders (the "***Registration Rights***

| | *Agreement*"). |
|---|---|
| **Tax Structure:** | To the extent practicable, the Restructuring contemplated by this Term Sheet will be structured so as to obtain the most beneficial tax structure for the Company, its equity holders post-transaction, holders of Existing Equity Interests, and holders of Senior Notes Claims, as determined by the Company and the Requisite Creditors. |
| **Consent Rights of Consenting Creditors:** | Notwithstanding anything to the contrary herein or in the Plan, any and all consent rights of the Consenting Creditors set forth in the RSA with respect to the Definitive Documents, including any amendments, restatements, supplements, or other modifications to such documents, will be incorporated into the Plan by reference and fully enforceable as if stated in full in the Plan. |
| **Restructuring Expenses:** | The Company will pay, immediately prior to the Petition Date, all Restructuring Expenses, including fees and expenses estimated to be incurred prior to the filing of the Chapter 11 Cases, for which invoices or receipts are furnished by the advisors to the Consenting Creditors at least one (1) Business Day prior thereto. |
| | On the Effective Date, without the need to file a fee or retention application in the Chapter 11 Cases, the Company will pay all Consenting Creditor Restructuring Expenses, including unpaid fees and expenses estimated to be incurred through the Effective Date to the extent invoiced at least one (1) Business Day before the Effective Date by the advisors to the Consenting Creditors. |
| | On the Effective Date, the Company will pay all unpaid Debtor Restructuring Expenses (in the case of Debtor Restructuring Expenses incurred prior to the Confirmation Date, solely to the extent approved by an order of the Bankruptcy Court), including unpaid fees and expenses estimated to be incurred from the Confirmation Date through the Effective Date to the extent invoiced at least one (1) Business Day before the Effective Date by the advisors to the Debtors. |
| **Retention of Jurisdiction:** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (i) resolution of Claims, (ii) allowance of compensation and expenses for pre-Effective Date services, (iii) resolution of motions, adversary proceedings, or other contested matters, (iv) entry of such orders as necessary to implement or consummate the Plan and any related documents or agreements, and (v) other customary purposes. |
| **Fiduciary Out**[2] | Notwithstanding anything to the contrary herein, nothing in this Term Sheet, the RSA, or any of the Definitive Documents shall require a Debtor or the board of directors, board of managers, or similar governing body of a |

---

[2]        [NTD: Provision to be mirrored in the RSA].

|  | Debtor, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law, and any such action or inaction pursuant to this provision shall not be deemed to constitute a breach of the RSA, this Term Sheet, or any of the Definitive Documents.<br><br>The Debtors may terminate the RSA, this Term Sheet or any Definitive Document if the board of directors, board of managers, or such similar governing body of any Debtor determines, after consulting with counsel and, after prompt written notice to counsel to the Consenting Creditors, (i) that proceeding with any of the transactions comprising the Restructuring would be inconsistent with the exercise of its fiduciary duties or applicable law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal. |

## ANNEX 1

### Defined Terms

| **Defined Terms** |
|---|

| *"Ad Hoc Noteholder Group"* | The ad hoc group of Senior Noteholders represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel, and PJT Partners LP, as financial advisor. |
|---|---|
| *"Administrative Expense Claim"* | Any right to payment constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services and payments for goods and other services and leased premises), (ii) Fee Claims, and (iii) Restructuring Expenses. |
| *"Allowed"* | With reference to any Claim or Interest, (i) any Claim or Interest arising on or before the Effective Date (a) as to which no objection to allowance has been interposed within the time period set forth in the Plan or (b) as to which any objection has been determined by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective holder, (ii) any Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (iii) any Claim or Interest expressly allowed under the Plan; *provided*, *however*, that notwithstanding the foregoing, the Reorganized Debtors will retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise unimpaired pursuant to the Plan. |
| *"Alternative Restructuring Proposal"* | Any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, tender offer, exchange offer, recapitalization, plan of reorganization, share exchange, business combination, joint venture, or similar transaction involving the Company or the debt, equity, or other interests in the Company that is an alternative to one or more of the transactions comprising the Restructuring. |
| *"Amended Organizational Documents"* | The forms of certificate of incorporation, certificate of formation, bylaws, limited liability company agreements, shareholder agreement (if any), or other similar organizational documents, as applicable, of the Reorganized Parent. |

| Defined Terms | |
|---|---|
| "*Business Day*" | Any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are authorized or required by law or executive order to close. |
| "*Cash*" | Legal tender of the United States of America. |
| "*Cause of Action*" | Any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws).  For the avoidance of doubt, Cause of Action also includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or Interests, (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (iv) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any state law fraudulent transfer claim. |
| "*Chapter 11 Cases*" | The jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court. |
| "*Claim*" | A "claim," as defined in section 101(5) of the Bankruptcy Code, as against any Debtor. |
| "*Confirmation Date*" | The date on which the Bankruptcy Court enters the Confirmation Order. |

| **Defined Terms** |
|---|

| "*Confirmation Order*" | The order of the Bankruptcy Court confirming the Plan in the Chapter 11 Cases. |
|---|---|
| "*Consenting Creditors*" | Those Senior Noteholders that are signatories to the RSA, and any subsequent Senior Noteholder that becomes party thereto in accordance with the terms of the RSA. |
| "*Consenting Creditor Restructuring Expenses*" | The reasonable and documented fees and expenses incurred by the Consenting Creditors' advisors pursuant to the terms of their fee letters, including, without limitation, (i) the reasonable and documented fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison, LLP, (ii) the reasonable and documented fees and expenses of Porter Hedges LLP and (iii) all monthly fees, restructuring, transaction and back-end fees payable to PJT Partners LP under and pursuant to its engagement letter, dated [March 31], 2020, executed by the Company, all of which fees shall be deemed reasonable for all purposes hereunder. |
| "*Debtor Restructuring Expenses*" | The reasonable and documented fees and expenses of Kirkland & Ellis LLP, Alvarez & Marsal North America, LLC, Moelis and Company, and local counsel to the Company, in each case that are due and owing after receipt of applicable invoices consistent with any applicable engagement letters, provided that with respect to fees and expenses incurred prior to the Confirmation Date, such fees and expenses must have been approved by an order of the Bankruptcy Court. |
| "*Disclosure Statement*" | The disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code. |
| "*DTC*" | The Depository Trust Company. |
| "*Effective Date*" | The date upon which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof and the Plan becomes effective. |
| "*Entity*" | An "entity," as defined in section 101(15) of the Bankruptcy Code. |
| "*Estate(s)*" | Individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code. |

| **Defined Terms** | |
|---|---|
| "***Exculpated Parties***" | Collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Consenting Creditors, (iv) the Ad Hoc Noteholder Group (v) any statutory committee appointed in the Chapter 11 Cases, and (vi) with respect to each of the foregoing Persons in clauses (i) through (v), such Person's predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Person's respective heirs, executors, estates, and nominees, in each case in their capacity as such. |
| "***Existing Equity Interests***" | Shares of the class of common stock of Parent that existed immediately prior to the Effective Date, including any restricted stock of Parent that vests prior to the Effective Date. |
| "***Exit Facility***" | The financing to be provided to the Reorganized Debtors on the Effective Date in accordance with the Plan and a commitment letter to be entered into by the Debtors and the providers of the Exit Facility, which financing will include a revolving or delayed-draw term loan credit facility with a minimum borrowing base and commitment amount on terms to be mutually agreed between the Company and the Requisite Creditors. |
| "***Fee Claim***" | A Claim for professional services rendered or costs incurred on or after the Petition Date through the Confirmation Date by professional persons retained by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, or 503(b) of the Bankruptcy Code in the Chapter 11 Cases. |
| "***Final Order***" | An order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final |

| Defined Terms | |
|---|---|
| | Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment. |
| "*Intercompany Claim*" | Any Claim against a Debtor held by another Debtor. |
| "*Intercompany Interest*" | Any Interest in a Debtor held by another Debtor; *provided* that no Existing Equity Interest shall be an Intercompany Interest. |
| "*Interest*" | Any equity interest (as defined in section 101(16) of the Bankruptcy Code) in the Company, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest or other instrument, evidencing any fixed or contingent ownership interest in the Company, whether or not transferable, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Company, that existed immediately before the Effective Date. |
| "*New Common Shares*" | Shares of common stock of Reorganized Parent. |
| "*Other Equity Interests*" | All Interests in Parent other than Existing Equity Interests. |
| "*Other Priority Claim*" | Any Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or a Priority Tax Claim. |
| "*Other Secured Claim*" | A Secured Claim other than a Priority Tax Claim, or a Revolving Credit Agreement Claim. |
| "*Person*" | Any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other Entity. |
| "*Plan*" | The chapter 11 plan of reorganization of the Company implementing the Restructuring, including all appendices, exhibits, schedules, and supplements thereto, as may be modified from time to time in accordance with its terms and the RSA. |
| "*Priority Tax Claim*" | Any Secured Claim or unsecured Claim of a governmental unit of the kind entitled to priority of payment as specified in sections 502(i) and |

| **Defined Terms** |
|---|

|  | 507(a)(8) of the Bankruptcy Code. |
|---|---|
| "***Pro Rata***" | The proportion that an Allowed Claim or Interest in a particular class bears to the aggregate amount of Allowed Claims or Interests in that class. |
| "***Registered Holder***" | A holder of Existing Equity Interests whose ownership interest is registered directly on the books and records of the Company's transfer agent. |
| "***Released Parties***" | Collectively, (i) the Consenting Creditors, (ii) the Ad Hoc Noteholder Group, (iii) the Senior Notes Trustee, (iv) the arrangers, agents and lenders under the Exit Facility, (v) the Revolving Credit Agreement Agent and the Revolving Credit Agreement Lenders, (vi) any Releasing Party, (vii) with respect to each of the foregoing Persons, in clauses (i) through (vi), each of their affiliates, and (viii) with respect to each of the foregoing Persons in clauses (i) through (vii), such Person's predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Person's respective heirs, executors, estates, and nominees, in each case in their capacity as such. |
| "***Releasing Parties***" | Collectively, (i) the holders of all Claims or Interests who vote to accept the Plan, (ii) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan, (iii) the holders of all Claims or Interests who vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, (iv) the holders of all Claims and Interests who were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, (v) all other holders of Claims and Interests to the maximum extent permitted by law, (vi) the Consenting Creditors, (vii) the Ad Hoc Noteholder Group, (viii) the Senior Notes Trustee, (ix) the arrangers, agents and lenders under the Exit Facility, (x) the Revolving Credit Agreement Agent and the Revolving Credit Agreement Lenders, (xi) any Releasing Party, (xii) with respect to each of the foregoing Persons, in clauses (i) through (xi), each of their affiliates, and (xiii) with respect to each of the foregoing Persons in clauses (i) through (xii), such Person's predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, |

| Defined Terms | |
|---|---|
| | attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Person's respective heirs, executors, estates, and nominees, in each case in their capacity as such. |
| "*Reorganized Debtors*" | Each of the Debtors as reorganized on the Effective Date in accordance with the Plan. |
| "*Reorganized Parent*" | Parent as reorganized on the Effective Date in accordance with the Plan. |
| "*Requisite Creditors*" | As of the date of determination, at least two (2) members of the Ad Hoc Noteholder Group that have signed the RSA holding a majority of the outstanding Senior Notes held by the Ad Hoc Noteholder Group that have signed the RSA as of such date. |
| "*Restructuring Expenses*" | All Creditor Restructuring Expenses and Debtor Restructuring Expenses. |
| "*Senior Notes Trustee*" | The Bank of New York Mellon Trust Company, N.A., as trustee under the Senior Notes indentures and its successors, assigns, or any replacement trustee appointed pursuant to the terms of the Senior Notes Indenture. |
| "*Secured Claim*" | A Claim (i) secured by a lien on collateral to the extent of the value of such collateral as (a) set forth in the Plan, (b) agreed to by the holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code. |
| "*Securities Act*" | Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, and any rules and regulations promulgated thereby. |
| "*Solicitation Materials*" | Collectively, the Disclosure Statement and the related solicitation materials. |
| "*Unimpaired*" | With respect to a Claim, Interest, or a class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code. |
| "*Warrants*" | Warrant-A issued to holders of Existing Equity Interests pursuant to the Plan as of the Effective Date that will be exercisable on a non-cash basis for a 4-year period after the Effective Date for a number of shares equal to 10% of the New Common Shares issued and outstanding as of |

| Defined Terms | |
|---|---|
| | the Effective Date in an amount equal to an implied 110% recovery to Senior Noteholders on account of the Senior Notes Claims, inclusive of non-default interest under the Senior Notes through the date of such exercise calculated as though the Senior Notes remained outstanding through the date of such exercise and all accrued and unpaid interest had been added to the outstanding principal amount of the Notes daily; and Warrant-B issued to holders of Existing Equity Interests pursuant to the Plan as of the Effective Date that will be exercisable on a non-cash basis for a 5-year period after the Effective Date for a number of shares equal to 5% of the New Common Shares issued and outstanding as of the Effective Date in an amount equal to an implied 125% recovery to Senior Noteholders on account of the Senior Notes Claims, inclusive of non-default interest under the Senior Notes through the date of such exercise calculated as though the Senior Notes remained outstanding through the date of such exercise and all accrued and unpaid interest had been added to the outstanding principal amount of the Notes daily; and; *provided*, *however*, that to the extent DTC requirements are applicable, if DTC is not able to provide for daily accretion, the Consenting Creditors agree to negotiate in good faith with the Debtors on alternative accretion schedules to address any such impediment. |
| "*Warrant Equity*" | The New Common Shares issuable upon the exercise of the Warrants, subject to dilution by the MIP Equity. |

## Exhibit A

**Form of Interim Cash Collateral Order**

**[INTENTIONALLY OMITTED]**