**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | * | Case No.   20-32021 (DRJ) |
| | * | |
| Whiting Petroleum Corporation, et al., | * | Chapter 11 |
| | * | |
| Debtors. | * | Jointly Administered |

**THE TGS ENTITIES' OBJECTION TO CONFIRMATION OF THE DEBTORS'
JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
WHITING PETROLEUM CORPORATION AND ITS DEBTOR AFFILIATES
AND TO ASSUMPTION OR ASSUMPTION AND ASSIGNMENT
OF THE TGS ENTITIES' LICENSE AGREEMENTS**
[Related to ECF Nos. 558 & 609]

TO THE HONORABLE DAVID R. JONES, UNITED STATES BANKRUPTCY JUDGE:

TGS-NOPEC Geophysical Company (successor in interest to TGS-Calibre Geophysical Company) and A2D Technologies, Inc., d/b/a TGS Geological Products and Services (successor in interest to A2D LP), collectively referred to hereinafter as "the TGS Entities", submit this objection to confirmation of the revised Joint Chapter 11 Plan of Reorganization [ECF No. 558] (the "Plan") filed herein by the debtors, Whiting Canadian Holding Company Unlimited Liability Corporation, Whiting Petroleum Corporation, Whiting US Holding Company, Whiting Oil and Gas Corporation, and Whiting Resources Corporation (each, a "Debtor" and collectively, the "Debtors"), as well as the proposed assumption or assumption and assignment of the License Agreements between the TGS Entities and one or more of the Debtors, and in support thereof, respectfully submit as follows:

## I.   INTRODUCTION

1.      The Court should deny confirmation of the Debtors' Plan because it contains material provisions that are contrary to the United States Bankruptcy Code (the "Bankruptcy

Code") and applicable bankruptcy law, as well as other that are contradictory to each other, thus rendering the Plan non-confirmable under Bankruptcy Code § 1129(a)(1).

2.      Specifically, the provision of the Plan that purports to nullify change of ownership or control provisions such as are contained in a number of the TGS Entities' License Agreements with the Debtors is contrary to law.

3.      The Plan further violates settled bankruptcy law to the extent it provides for a change of ownership and control of the Debtors in violation of the change of ownership or control provisions of some of the TGS Entities' License Agreements, but purports to enable the Debtors to assume the License Agreements without requiring that the Debtors cure all defaults thereunder, including those under the change of ownership or control provisions and provide adequate assurance of future performance thereof.

4.      In addition, while the Debtors' Plan, in one paragraph, provides that assumption of an executory contract and payment in full of the applicable Cure Costs "shall result in the full release and satisfaction of any Cures, Claims, or defaults . . . including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption", another paragraph of the Plan provides that executory contracts that contain "a change of control or similar provision that would be triggered by the Chapter 11 Cases. . ." are not being assumed by the Debtors under the Plan. These conflicting provisions cause an ambiguity in the Plan, as it is impossible for the TGS Entities and other similarly situated creditors to know whether their contracts containing change in ownership or control clause are to

be rejected under the Plan or rather assumed, but with the change in ownership or control provisions nullified.

5.      In addition to the foregoing objections to confirmation of the Debtors Plan, the TGS Entities object to the Debtors' proposed assumption of the following TGS Entity License Agreements, which the Debtors listed in the Schedule of Assumed Executory Contracts and Unexpired Leases filed along with their Notice of Plan Supplement as being proposed to be assumed for a "Cure Cost" of $125.17: "A2D LOG-LINE PLUS OPERATING, LICENSE AGREEMENTS AND SUPPLEMENTS" with Whiting Oil and Gas Corporation. The TGS Entities object to the assumption of any such License Agreements as the description provided by the Debtors makes it impossible for the TGS Entities to determine exactly what License Agreements between the TGS Entities and Whiting Oil and Gas Corporation the Debtors seek to assume, and whether or not the TGS Entities have a basis upon which to object thereto.

6.      Finally, the TGS Entities object to any assumption of the Master License Agreement for Geological Data No. 3833 dated April 1, 2018 between the TGS Entities and Whiting Petroleum Corporation, as well as Supplement Nos. 1, 2 and 3 thereto, because they contain valid change in ownership and control provisions which will be breached by the Debtors and will result in termination thereof upon confirmation of the Debtors' Plan, and the Debtors cannot assume or assume and assign those License Agreements without curing all defaults thereunder, including any defaults under the change in ownership or control provisions and/or monetary defaults, and providing the TGS Entities with adequate assurance of future performance thereof, as required by law.

## II.      <u>BACKGROUND</u>

3

7.     The TGS Entities are affiliated geophysical services companies that are in the business, *inter alia*, of providing worldwide geoscientific data products and services to the oil and gas industry for the purpose of providing descriptions of subsurface geology for potential oil and gas exploration and/or production and other uses. These products include, but are not limited to, 2D, 3D and other types of seismic surveys and images, and/or well and petroleum data, which are generally offered to licensees on a multi-client basis for a limited term.

8.     The Debtors are parts of an integrated independent oil and natural gas exploration and production company that are engaged in the exploration, development and production of oil and natural gas properties primarily in North Dakota and the Rocky Mountain region, with additional oil and gas properties located in Texas.

9.     Debtor, Whiting Petroleum Corporation ("WPC") is a publicly traded entity that directly or indirectly owns the majority of the common stock of and controls each of the other Debtors.[1] As of the December 31, 2019, WPC had issued and outstanding approximately 91,326,469 shares of common stock. Further, as of February 20, 2020, there were 444 holders of record of WPC common stock.[2]

10.    WPC is managed by a Board of Directors that is currently composed of eight (8) individuals.[3] The Board is divided into three (3) classes of directors with staggered terms of three (3) years each, so that each year the term of one (1) class expires.[4] Holders of common stock in WPC are entitled to one (1) vote for each share held on all matters submitted to a vote of the

---

[1] Disclosure Statement Relating to the Joint Chapter 11 Plan of Reorganization of Whiting Petroleum Corporation and its Debtor Affiliates (the "Disclosure Statement") [ECF No. 566], at p. 37 of 215.
[2] *Id.* at p. 43 of 215.
[3] *See* Debtors' Website, https://whiting.com/.
[4] *See* WPC Form 10K for the Fiscal Year December 31, 2019, Exhibit 4.9.

stockholders, and thus, holders of a majority of the shares may elect all of the directors standing for election.[5]

### III.   THE BANKRUPTCY CASE

11.     On April 1, 2020 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of Title 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to Bankruptcy Code §§1107 and 1108(a).

12.     On April 15, 2019, the Debtors filed their Plan [ECF No. 558] and Disclosure Statement [ECF No. 566].

13.     By Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures With Respect to Confirmation of the Proposed Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates With Respect Thereto, and (V) Granting Related Relief entered on July 1, 2020 [ECF No. 576] (the "Scheduling Order"), the Court, among other things, approved the Disclosure Statement, approved the Debtors' proposed solicitation materials, scheduled a hearing on confirmation of the Debtors' Plan for August 10, 2020, and established various deadlines relating to same.

14.     The Debtors' Plan is governed in large part by the terms of a Restructuring Support Agreement dated April 23, 2020 ("the Restructuring Support Agreement") executed by the Debtors and the "Consenting Creditors.[6] The signature page of the Restructuring Support Agreement has been deleted, so the identifies of each of the Consenting Creditors are unknown at this time to the

---

[5] *Id.*
[6] Restructuring Support Agreement, attached as Exhibit B to the Disclosure Statement [ECF No. 566], at p. 151 of 215.

TGS Entities. However, the agreement describes them as beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that are beneficial holders of, Senior Notes Claims.[7] Further, the Disclosure Statement indicates that as of the date thereof, the Consenting Creditors include holders of approximately 44.7% of the Senior Notes and at least 12.0% of the Convertible Notes.[8]

15.     The Plan is premised upon a de-leveraging of the Debtors by reduction of greater than $2.5 billion of debt (not including inter-company debt) and conversion of that debt into equity. Under the Plan, all holders of "Allowed Other Secured Claims" are, at the Debtors' option, to receive payment in full, return of their collateral, reinstatement of their claims, or such other treatment as to render them unimpaired. Holders of "Allowed Other Priority Claims" are to receive payment in full. Moreover, holders of "Allowed RBL Claims" are, if they vote to accept the Plan and elect to participate in an Exit Facility, to receive a pro rata share of (i) the "Exit Facility Revolving Loan Commitments" and (ii) "Exit Facility Effective Date Cash Amount". If they vote against the Plan, do not vote, or do not elect to participate in the Exit Facility, Allowed RBL Claim holders are to receive a pro rata share of the "Exit Facility Term Loans".[9]

16.     Moreover, the Plan provides for holders of "Allowed Trade Claims" to be paid in full on the Effective Date of the Plan or otherwise in the ordinary course of business.[10] Nevertheless, holders of "Allowed General Unsecured Claims" are to receive a pro rata share of approximately 97% of the New Common Stock of the Reorganized WPC (subject to possible dilution) and "Existing Interests" (current equity holders) are to have their current equity interests

---

[7]  *Id.* at p. 152 of 215.
[8]  Disclosure Statement [ECF No. 566], at p. 11 of 215.
[9]  Plan [ECF No. 558], at pp. 26-7 of 135.
[10]  *Id.* at p. 27 of 135.

in WPC cancelled; however, depending on the circumstances they each could receive a pro rata share of up to 3 % of the New Common Stock of the Reorganized WPC.[11]

17.     According to the Plan, each of the Debtors are to continue to exist after the Effective Date as a separate entity, unless otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement.[12]

18.     Further, as of the Effective Date of the Plan, the terms of all current members of the Boards of Directors and officers of WPC and each Debtor-subsidiary are to expire, and new directors and officers of the reorganized WPC and its subsidiaries are to be appointed.[13] The Plan provides that the reorganized WPC Board will consist of (i) the Reorganized Debtors' chief executive officer and (ii) the other directors selected by the "Requisite Creditors", whose identities shall be disclosed in the Plan Supplement.[14] The term "Requisite Creditors" is defined in the Plan, however, as meaning at least two (2) members of the Ad Hoc Committee of Noteholders that have signed the Restructuring Support Agreement, that hold a majority of the outstanding Senior Notes held by the Ad Hoc Committee that signed the agreement".[15]

19.     The Debtors filed their Plan Supplement on July 18, 2020. The Plan Supplement does not disclose the new members of the Board of Directors of reorganized WPC to be appointed as of the Effective Date of the Plan. Rather, all it reveals is that one of the new directors will be Bradley J. Holly, Chief Executive Officer of the reorganized WPC, and the other directors will be "those additional directors selected by the Requisite Creditors, whose identities shall be disclosed

---

[11] *Id*. at pp. 28-9 of 135.
[12] *Id*. at p. 35 of 135.
[13] *Id*.
[14] *Id*.
[15] *Id*. at p. 20 of 135.

in a revised version of the Plan Supplement prior to the commencement of the Confirmation Hearing".[16]

20.     As to executory contracts, the Plan generally provides that all executory contracts are to be deemed assumed, unless it: (1) was previously assumed or rejected, (2) was previously expired or terminated, (3) is the subject of a motion to reject, (4) **contains a change of control or similar provision that would be triggered by the Chapter 11 case (unless such provision has been irrevocably waived),** or (5) is designated as rejected on the Schedule of Rejected Executory Contracts and Unexpired Leases to be filed in the Plan Supplement.[17]  Counterparties to executory contracts that are to be assumed and which have monetary defaults are supposed to receive a Notice of proposed Cure from the Debtors, and if the counterparty objects to the Cure Notice it is required to file an objection to the proposed Cure with the Solicitation Agent on or before 14 days after receiving the applicable Cure Notice.[18]  Any other objections to the assumption of an executory contract must be filed with the Bankruptcy Court on or before the Confirmation Hearing.[19]

21.     Significantly, the Plan provides that assumption of an executory contract and payment in full of the applicable Cure Costs "shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, **including defaults of provisions restricting the change in control or ownership interest composition** or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption" (emphasis added).[20]

---

[16] Plan Supplement [ECF No. 609], Exhibit E, at p. 167 of 432.
[17] Plan [ECF No. 558], at pp. 37-8 of 135.
[18] *Id.* at p. 38 of 135.
[19] *Id.* at p. 39 of 135.
[20] *Id.*

22.     The Debtors filed Schedules of Assumed Executory Contracts and Unexpired Leases and of Rejected Executory Contracts and Unexpired Leases on April 26, 2019 along with their Plan Supplement. The Schedule of Assumed Executory Contracts and Unexpired Leases lists the following TGS Entity License Agreements with the Debtors as being assumed for a "Cure Cost" of $125.17: "A2D LOG-LINE PLUS OPERATING, LICENSE AGREEMENTS AND SUPPLEMENTS" with Whiting Oil and Gas Corporation.[21] The TGS Entities cannot determine from this description (and from the proposed Cure Cost) exactly what License Agreements the Debtors seek to assume.

23.     Moreover, other License Agreements between the TGS Entities and the Debtors are not listed on either the Schedule of Assumed Executory Contracts and Unexpired Leases or Schedule of Rejected Executory Contracts and Unexpired Leases. A number of these contain change in ownership or control provisions, which the TGS Entities, as shown below, assert are valid and enforceable. Because of inconsistencies in the terms of the Plan regarding the treatment of executory contracts containing such provisions, the TGS Entities cannot tell from the Debtors' failure to list these License Agreements on either the Schedules of Assumed or Rejected Executory Contracts how the Debtors and their Plan propose to treat these License Agreements. For those reasons and others set forth herein, the TGS Entities file this Objection to confirmation of the Debtors' Plan and to assumption or assignment and assignment of their License Agreements with the Debtors.

## IV. THE PRE-BANKRUPTCY RELATIONSHIPS BETWEEN
## THE TGS ENTITIES AND THE DEBTORS

---

[21] Schedule of Assumed Executory Contracts and Unexpired Leases, Exhibit F to Notice of Plan Supplement [ECF No. 609], at p. 169 of 432.

24.     Prior to the filing of the Debtors' Bankruptcy Petitions, the TGS Entities licensed geophysical, well, petroleum and other data and information to one or more of the Debtors pursuant to one or more written license agreements (collectively, the "License Agreements").

25.     Specifically, by Master License Agreement For Geophysical Data dated October 16, 1995 between TGS-Calibre Geophysical Company and WPC (the "Initial Seismic License"), the TGS Entities licensed certain proprietary geophysical (seismic) data and derivatives thereof owned by them to WPC on a non-exclusive basis, for a designated period of time, subject to certain fee arrangements, confidentiality provisions, transfer restrictions, and other terms set forth therein and in certain supplemental agreements executed in connection therewith.

26.     By Master License Agreement for Geological Data No. 3833 dated April 1, 2018 between A2D Technologies, Inc., d/b/a TGS Geological Products and Services ("A2D") and WPC, as supplemented by Supplement Nos. 1, 2 and 3 thereto (the "New Geological Licenses"), the TGS Entities granted WPC a non-exclusive license, for a designated period of time and subject to certain fee arrangements, confidentiality provisions, transfer restrictions, and other terms contained therein, to access through the TGS R360© and/or LOG-LINE Plus© e-commerce portals and use certain proprietary geological, well, petroleum and other data and derivatives owned by the TGS Entities, as well as presentation software owned or licensed by the TGS Entities.

27.     By LOG-LINE Plus© Operating Agreement dated October 1, 2006 (the "2006 LOG-LINE Plus© License") between A2D LP and Whiting Oil and Gas Corporation ("WOG"), the TGS Entities licensed certain proprietary petroleum data and derivatives thereof owned by them to WOG on a non-exclusive basis, for a designated period of time, subject to certain fee arrangements, confidentiality provisions, transfer restrictions, and other terms set forth therein.

28.     By Oyster Plan and LAS Underwriter Addendum dated April 18, 2008 between A2D and WOG (the "2008 Oyster Plan"), the TGS Entities granted WOG a non-exclusive license, for a designated period of time, to access and use certain TGS raster and smartRASTER© Images from the TGS LOG-LINE Plus© database in the domestic United States, and certain LAS well data collected from the Phase 1 and 2 of the domestic United States and Canada subject to certain fee arrangements, confidentiality provisions, transfer restrictions, and other terms contained therein.

29.     By Amendment I to the 2008 Oyster Plan dated March 1, 2011 between A2D and WOG (the "2008 Oyster Plan Amendment I"), the terms of the Oyster Plan and LAS Underwriter Addendum dated April 18, 2008 were extended and amended as provided therein.

30.     By Oyster Plan and LAS Underwriter Addendum dated December 2, 2014 between the A2D and WOG (the "2014 Addendum to the Oyster Plan"), the TGS Entities granted WOG a non-exclusive license, for a designated period of time, to access and use certain TGS raster and smartRASTER© Images from the TGS OG-LINE Plus© database in the domestic United States, subject to certain fee arrangements, confidentiality provisions, transfer restrictions, and other terms contained therein.

31.     By Addendum I to the LOG-LINE Plus© Operating Agreement effective March 1, 2015 between A2D and WOG (the "2015 Addendum I to the LOG-LINE Plus© Operating Agreement"), WOG's license of the TGS Entities' smartRASTER© data was, among other things, converted from a limited term license to a perpetual license, in accordance with the terms set forth therein.

32.     By Addendum II to the LOG-LINE Plus© Operating Agreement effective March

1, 2015 between A2D and WOG (the "2015 Addendum II to the LOG-LINE Plus© Operating Agreement"), WOG's license of certain well log data from the TGS Entities, among other things, was converted from a limited term license to a perpetual license, in accordance with the terms set forth therein.

## V.   THE TGS ENTITIES' OBJECTIONS TO CONFIRMATION OF THE DEBTORS' PLAN AND TO ASSUMPTION OR ASSUMPTION AND ASSIGNMENT OF ITS LICENSE AGREEMENTS WITH THE DEBTORS

A.     Each of the Licenses is an Executory Contract.

33.     The License Agreements between the TGS Entities and the Debtors are each executory contracts within the meaning of Bankruptcy Code § 365 as, among other things, the Debtors have continuing confidentiality obligations to the TGS Entities under those agreements and restrictions upon their use of the licensed geophysical and geological materials, data and other information, while, at the same time, the TGS Entities have continuing obligations to allow the applicable Debtors to use the materials, data and other information, and to defend legal proceedings arising out of the licensing thereof. *See, e.g., In re Aerobox Composite Structures*, LLC, 373 B.R. 135 (Bankr. D.N.M. 7/27/07) (patent and technology license agreement found executory based primarily on continuing obligations of both parties to maintain confidentiality); *In re Chapin Revenue Cycle Management, LLC*, 343 B.R. 728 (Bankr. M.D.Fla. 3/1/06) (computer software licensing agreement held to be executory contract where the licensor had obligation to allow continued use by debtor and debtor had obligation to maintain confidentiality of software).   *See also In re Sunterra Corporation*, 361 F. 3d 257 (4th Cir. 3/18/04) (computer software licensing agreement held executory due to confidentiality obligations); *In re Superior Toy & Mfg. Co.*, 78 F. 3d 1169 (7th Cir. 3/7/96) (trademark license found to be executory contract).

B.     The Plan Contains Contradictory Provisions Regarding the Treatment of Executory Contracts Containing Change in Ownership or Control Provisions that Render the Plan Ambiguous.

34.     Article V.A. of the Plan provides, in pertinent part, that:

"**Unless** an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court entered prior to the Effective Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, (iv) **contains a change of control or similar provision that would be triggered by the Chapter 11 Cases** (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Executory Contracts and Unexpired Leases, on the Effective Date, each Executory Contract and Unexpired Lease **shall be deemed assumed** . . ." (emphasis added).[22]

35.     While it would appear that under Article V.A of the Plan, executory contracts containing change in ownership or control provisions are not to be assumed by the Debtors, Article V.C of the Plan goes on to provide that:

"Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure Costs pursuant to this Article V.C **shall result in the full release and satisfaction** of any Cures, Claims, or defaults, whether monetary or nonmonetary, **including defaults of provisions restricting the change in control or ownership interest composition** or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. (emphasis added).[23]

36.     Thus, under Article V.C of the Plan, even though the Debtors have indicated that they are not assuming executory contracts that have change in ownership or control language, the Plan still nullifies change in ownership or control provisions contained in any executory contracts that the Debtors assume.

37.     The foregoing provision of the Plan create an ambiguity that renders it difficult, if

---

[22] Plan [ECF No. 558], at pp. 37-8 of 135.
[23] *Id.* at p. 39 of 135.

not impossible, for the TGS Entities and other similarly situated counter-parties to executory contracts to know whether their contracts containing change in ownership or control clauses are to be rejected under the Plan or, instead, assumed but with their change in ownership or control clauses purportedly invalidated.

38.     The Debtors should be ordered to clarify their intentions under the foregoing provisions of the Plan, or the Plan should be rejected.

C.     The Plan Provision Purporting to Invalidate the Change in Ownership or Control Provisions Contained in the New Geological Licenses Between the TGS Entities and WPC is Contrary to Law, and the Debtors Cannot Assume those Licenses Without Curing all Defaults thereunder, Including Under the Change in Ownership or Control Provision and Regarding the Monetary Default that Exist Thereunder.

39.     In order to assume an executory contract, a debtor is generally required to (a) cure any existing default under the contract or provide "adequate assurance" of a prompt cure; (b) compensate or provide adequate assurance that the debtor will compensate the other party to the contract for any actual pecuniary loss arising from the debtor's default thereunder; and (c) provide "adequate assurance of future performance" under the contract to the other party. Bankruptcy Code § 365(b)(1).  These requirements apply to defaults that occur under executory contracts either before or after commencement of the case.  *In re Luce Industries, Inc*., 8 B.R. 100, 104 (Bankr. S.D.N.Y. 1980), *rev'd on other grds*., 14 B.R. 529 (S.D.N.Y. 1981).

40.     Moreover, it is well settled that an executory contract must generally be accepted in its entirety or not at all.   One cannot reject the burdens of an executory contract and accept only the benefits.  *In re E-Z Serve Convenience Stores, Inc*., 289 B.R. 45, 49 (Bankr. M.D.N.C. 2003); *In re Rovine Corp.*, 6 B.R. 661, 666 (Bankr. W.D.Tenn. 1980).

41.     The New Geological Licenses entered into by WPC with the TGS Entities contain change in ownership or control provisions that automatically terminates the license in the event of a change of "Ownership" or "Control" of WPC, without the prior written consent of the TGS Entities.

42.     The New Geological Licenses unambiguously provide that unless WPC has obtained the prior written consent of the TGS Entities, the New Geological Licenses and the right of Use of the licensed Materials "**shall automatically terminate at the time an Acquisition occurs**",[24] and define the term "Acquisition" as meaning "the event of an Acquiror, directly or indirectly, (i) acquiring all or substantially all of the assets of Licensee; or (ii) **Ownership or Control of Licensee**, whether accomplished voluntarily or through operation of law, by statutory merger, consolidation or share exchange, by stock or asset sale or purchase, or by any other transaction method . . ." (emphasis added).[25]

43.     Moreover, the New Geological Licenses define the terms "Ownership" and "Control" as follows:

    a.     "Ownership" means the "direct or indirect rights in, or legal title to, greater than fifty percent (50%) of (i) outstanding common stock or other voting securities, (ii) equity interest, (iii) economic interest, (iv) voting power, (v) management or, (vi) interests in the profits".

    b.     "Control" means "the ability to, directly or indirectly, direct, manage or dictate the actions of, or determine the management of, the entity in question by any method, including, without limitation, by the election of members of the board of directors or other governing body of such entity, by having the ability to exercise control over a majority number of members of such governing body or through the Ownership of, or the exercise of voting or

---

[24] Master License Agreement for Geological Data No. 3833 dated April 1, 2018, § 7.1, at p. 4.

[25] *Id.* at ¶ 7.2. The term "Acquiror" is defined as "a person (or group of persons acting in concert), who acquires, directly or indirectly, (i) all or substantially all of the assets of Licensee or (ii) Ownership or Control of Licensee". *Id.* at ¶ 1.1.

consensual right with respect to, the common stock, voting securities or other interest held in such entity. . .".[26]

44.     The Debtors' Plan envisions and clearly results in a change of Ownership and Control of WPC, as those terms are defined in the New Geological Licenses. Among other things, the Plan provides for current owners of the common stock of WPC to lose their equity interests[27] and for the holders of General Unsecured Claims to become the new owners of approximately 97% of WPC's New Common Stock.[28] Further, as of the Effective Date of the Plan, the terms of all current members of the Boards of Directors and officers of WPC and each Debtor-subsidiary are to expire, and New Boards and officers of reorganized WPC and its subsidiaries are to be appointed.[29] While the Debtors have not yet disclosed who will be on the New Board of WPC, other than its CEO, what is known is that the other directors will be selected by the "Requisite Creditors", rather than by the prior stockholders of WPC.[30]

45.     Change in ownership or control provisions of the type contained in the New Geological Licenses have been held to be valid and enforceable against a debtor. *See, e.g.*, *In re Washington Capital Aviation & Leasing*, 156 B.R. 167, 174 (Bankr. E.D.Va. 1993).

46.     Although 11 U.S.C. § 365(e) and (f) generally provide that *ipso facto* and anti-assignment clauses in executory contracts can be stricken as contrary to the Bankruptcy Code, it has been held that 11 U.S.C. § 365(e) and (f) do not operate to invalidate clauses that permit termination of a contract upon a change in control of the debtor party.  *In re Washington Capital Aviation & Leasing*, 156 B.R. at 174 (noting that the change in control provision at issue was

---

[26] *Id.*
[27] S*ee* Plan [ECF No. 558] at pp. 28-9 of 135.
[28] *Id.*
[29] *Id.* at p. 35 of 135.
[30] *Id.*

16

neither an *ipso facto* clause nor a non-assignment clause).

47.    In any event, courts recognize that executory contracts should be evaluated on a case-by-case basis to determine the effect of enforcement of these types of provisions on both the debtor party and the non-debtor party, specifically including the extent of the economic detriment suffered by the non-debtor party. *See In re E-Z Serve*, 289 B.R. at 50 (noting that a bankruptcy court's "authority to excise a bargained for element of a contract is questionable" and that "modification of a nondebtor contracting party's rights is not to be taken lightly").

48.    Here, the change in ownership or control restrictions in the New Geological Licenses are critical to the TGS Entities' business model as the TGS Entities make a substantial investment in creating their own geophysical and geological data and interpretations thereof, and earns revenue by granting non-exclusive access to this data to multiple customers under restrictive license agreements.   If the change in ownership or control restrictions are not enforced, the value of those licenses will be severely diminished.   For this reason, the change in ownership or control provisions in the New Geological Licenses are essential, bargained-for elements of the TGS Entities' New Geological Licenses with WPC, which should be enforced.

49.    Accordingly, the provision in the Debtors' Plan that purports to nullify change of ownership or control provisions such as are contained in the TGS Entities' New Geological Licenses is contrary to bankruptcy law. Moreover, to the extent the Plan provides for a change of ownership or control of the Debtors in violation of the change of ownership or control provision of the TGS Entities' New Geological Licenses and/or the Plan otherwise authorizes the Debtors to assume the New Geological Licenses without properly curing all defaults thereunder, including under the change of ownership or control provision and providing adequate assurance of future

17

performance thereof, the Plan further violates settled bankruptcy law. For both of those reasons, confirmation of the Debtors' Plan should be denied.

50.     In any event, even if the Plan provision purporting to nullify the change in ownership or control provision in the TGS Entities New Geological Licenses was found by the Court to be valid, the TGS Entities still object to any assumption of the New Geological Licenses by the Debtors unless the Debtors cure all other defaults thereunder, including the Debtors' default in payment of the sum of $6,842.73 owing under the New Geological Licenses, as required by Bankruptcy Code § 365(b)(1).

D.     <u>Alternatively, Should the Court Determine that the Change in Ownership or Control Provision in the New Geological Licenses is an Invalid "Anti-Assignment" Clause under Bankruptcy Code § 365(f), the New Geological Licenses are non-assumable and non-assignable under Bankruptcy Code § 365 (c)(1)(A).</u>

51.     Although Bankruptcy Code § 365(a) gives a debtor or trustee, with court approval, the right to assume (or reject) executory contracts, and Bankruptcy Code § 365(f) generally gives the debtor or trustee the power to assign executory contracts, Bankruptcy Code § 365(c)(1)(A) contains an exception to both of those grants of authority.  Bankruptcy Code § 365(c)(1)(A) provides that a trustee may <u>not</u> assume or assign an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if:

> (a) "applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession . . .," and (b) "such party does not consent to such assumption or assignment . . .".

*ii.*     *Trade Secret Law is "Applicable Law" Preventing Assumption or Assumption and Assignment as Proposed by the Debtors in their Plan under § 365(c)(1)(A)*

52.     It has been held that the phrase "applicable law" as used in Bankruptcy Code §

18

365(c)(1)(A) means "any law applicable to a contract, other than bankruptcy law". *See In re XMH Corp.*, 647 F.3d 690, 695 (7th Cir. 2011). The TGS Entities assert that Texas and U.S. trade secrets laws constitute "applicable law" under Bankruptcy Code § 365(c)(1)(A) and excuse the TGS Entities from accepting performance from or rendering performance to an entity other than WPC, thus precluding assumption or assumption and assignment of the TGS Entities' New Geological Licenses without TGS's consent.[31]

53.    The Texas Supreme Court has defined a trade secret as "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003). It is axiomatic that the secrecy of a trade secret is of paramount importance for the information to maintain its value: trade secrets must necessarily remain secret to be useful to the owner. *See generally Rugen v. Interactive Bus. Sys., Inc*., 864 S.W.2d 548, 552 (Tex.App.-Dallas 1993, no writ) ("[A] trade secret can exist in a combination of characteristics and components[,] each of which, by itself, is in the public domain, but the unified process, [the] design and operation of which in unique combination[ ] affords a competitive advantage, is a protected trade secret.")

54.    It has been uniformly held that seismic data is a protected trade secret under Texas law. *See, e.g., In re Bass*, 113 S.W.3d 735, 742 (Tex. 2003). *See also Musser David Land Co. v. Union Pac. Res*., 201 F.3d 561, 569 (5th Cir. 2000). In determining that seismic data is considered a trade secret, the Texas Supreme Court has recognized that seismic data and other methods for obtaining subsurface geological information are widely considered trade secrets both

---

[31] The License Agreements each stipulate that Texas law is to be the law governing the agreements.

within the oil and gas industry and at law. *See In re Bass*, 113 S.W.3d at 742. Further, the United States Bankruptcy Court for the Western District of Texas has also found subsurface data, including both seismic and microseismic data and well logs, to be entitled to trade secret protection under Texas law. *In re TXCO Res., Inc.*, 475 B.R. 781 (Bankr. W.D. Tex. 2012). This Court should follow the Texas Supreme Court, the Fifth Circuit and the Western District of Texas by finding that the geological Data and Materials licensed to UPC by TGS are likewise trade secrets.

55.     Indeed, in the New Geological Licenses between the TGS Entities and WPC, WPC acknowledged and agreed that the Materials licensed to it thereunder constitute valuable, proprietary and highly confidential trade secrets and intellectual property of the TGS Entities.[32]

56.     Under the Texas version of the Uniform Trade Secrets Act, an actionable misappropriation is considered to exist and may be enjoined when a disclosure or use of a trade secret occurs without the express or implied consent of the owner.[33]   Tex. Civ. Prac. & Rem. Code § 134A.002(3). Further, a person who, without the owner's consent, knowingly communicates or transmits a trade secret, is guilty of committing a felony. *See* Tex. Penal Code § 31.05.

57.     Similarly, the Defend Trade Secrets Act of 2016 creates a federal cause of action for trade secret misappropriation that in large part mirrors the Uniform Trade Secrets Act. The definition of the term "trade secret" in the Defend Trade Secrets Act ("DTSA") is similar to the definition found in the Uniform Trade Secrets Act, and the remedies set forth in the DTSA are in large part, similar to the state version.[34] *See* 18 U.S.C. § 1836 *et seq*. Further, while the DTSA

---

[32] Master License Agreement for Geological Data No. 3833 dated April 1, 2018, § 4.1, at p. 3.

[33] A trade secret is defined as information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Uniform Trade Secrets Act, § 1(4).

[34] On the other hand, the DTSA provides an ex parte seizure procedure for use where the party against whom the

creates federal jurisdiction over trade secret theft, it does not preempt state trade secret law and allows trade secret owners to pursue federal civil remedies as an alternative to or in addition to existing state remedies. 18 U.S.C. § 1838.

58.     Although there is no case law specifically discussing whether trade secret law is "applicable law" under § 365(c)(1)(A), the trade secrets laws serve similar purposes to other laws considered "applicable law" under § 365(c)(1)(A), such as federal trademark, patent and copyright law, which prohibit nonconsensual assignments in order to provide protection to owners of information or materials that derive their value from being difficult to develop, unique and/or not publicly available by limiting who can use the information or materials without the owner's consent.[35]   Moreover, under both the Texas Uniform Trade Secrets Act and the Defend Trade Secrets Act of 2016, any transfer or use of a trade secret requires the express or implied consent of the owner thereof.   Thus, the Texas Uniform Trade Secrets Act and the Defend Trade Secrets Act of 2016 should be found to constitute "applicable law" under Bankruptcy Code § 365(c)(1)(A) that excuses the TGS Entities from accepting performance from or rendering performance under its License Agreements to entities other than WPC.

---

seizure is ordered "would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person...." 18 U.S.C. § 1836(b)(2).

[35] *See e.g. In re Trump Entm't Resorts, Inc*., 526 B.R. 116, 124 (Bankr. D. Del. 2015)("federal trademark law generally bans assignment of trademark licenses absent the licensor's consent because, in order to ensure that all products bearing its trademark are of uniform quality, the identity of the licensee is crucially important to the licensor"); *In re CFLC, Inc.*, 89 F.3d 673, 679 (9th Cir. 1996)(The fundamental policy of the patent system is to "encourag[e] the creation and disclosure of new, useful, and non-obvious advances in technology and design" by granting the inventor the reward of "the exclusive right to practice the invention for a period of years"… free assignability—of nonexclusive patent licenses would undermine the reward that encourages invention because a party seeking to use the patented invention could either seek a license from the patent holder or seek an assignment of an existing patent license from a licensee. In essence, every licensee would become a potential competitor with the licensor-patent holder in the market for licenses under the patents."); *In re Patient Educ. Media, Inc*., 210 B.R. 237, 242 (Bankr. S.D.N.Y. 1997)("The federal policy designed to protect the limited monopoly of copyright owners and restrict unauthorized use constitutes applicable nonbankruptcy law. It prevents the trustee from assigning the nonexclusive license absent the owner's consent.")

59.     Because the TGS Entities' New Geological Licenses are protected under trade secret law, Bankruptcy Code § 365 (c)(1)(A) prohibits their assumption or assumption and assignment by the Debtors without the TGS Entities' consent, notwithstanding any provision of the Plan to the contrary.

E.     The TGS Entities Cannot Determine What License Agreements the Debtors Propose to Assume by Listing the "A2D LOG-LINE PLUS OPERATING, LICENSE AGREEMENTS AND SUPPLEMENTS" with WOG on their Schedule of Assumed Executory Contracts and Unexpired Leases.

60.     On the Schedule of Assumed Executory Contracts and Unexpired Leases filed along with their Notice of Plan Supplement, the Debtors listed the following contracts as being proposed to be assumed for a "Cure Cost" of $125.17: "A2D LOG-LINE PLUS OPERATING, LICENSE AGREEMENTS AND SUPPLEMENTS" with WOG.[36]

61.     The TGS Entities object to the assumption of any such License Agreements as the description provided by the Debtors makes it impossible for the TGS Entities to determine exactly what License Agreements between the TGS Entities and WOG the Debtors seek to assume.

62.     The TGS Entities have a number of License Agreements with WOG, i.e., the 2006 LOG-LINE Plus© License, 2008 Oyster Plan, 2008 Oyster Plan Amendment I, 2014 Addendum to the Oyster Plan, 2015 Addendum I to the LOG-LINE Plus© Operating Agreement, and 2015 Addendum II to the LOG-LINE Plus© Operating Agreement. Thus, the TGS Entities reserve the right to assert other objections to the assumption or assumption and assignment of any of the foregoing License Agreements, upon the Debtors clarifying or disclosing the identities of the License Agreements between the TGS Entities and WOG that the Debtors seek to assume.

---

[36] Schedule of Assumed Executory Contracts and Unexpired Leases, Exhibit F to Notice of Plan Supplement [ECF No. 609], at p. 169 of 432.

## VI.   RESERVATION OF RIGHTS

63.     The TGS Entities reserve the right to raise other objections they may have to confirmation of the Debtors' proposed Plan and assumption or assumption and assignment of the TGS Entities' License Agreements, as well as all other rights including, without limitation, the right to file any such further and additional objections to any filings in this proceeding that they deem appropriate.

## VII.   CONCLUSION

For the foregoing reasons, the TGS Entities pray that the Court: (a) deny confirmation of the Debtors' Plan as written; (b) deny any assumption or assumption and assignment by the Debtors of the New Geological Licenses between the TGS Entities and WPC; (c) deny the Debtors' proposed assumption of any of the License Agreements between the TGS Entities and WOG unless and until the Debtors clarify exactly which of such licenses the Debtors actually seek to assume, reserving the right of the TGS Entities, thereafter, to assert any objections they may have regarding same; and (d) provide the TGS Entities any other and further relief as is just and equitable.

Respectfully submitted,

*/s/ Andrew A. Braun*
ANDREW A. BRAUN
GIEGER, LABORDE & LAPEROUSE, L.L.C.
Suite 4800, 701 Poydras Street
New Orleans, Louisiana   70139-4800
Telephone:   (504) 561-0400
Facsimile: (504) 561-0100
Email: abraun@glllaw.com

*Counsel for TGS-NOPEC Geophysical*
*Company and A2D Technologies, Inc., d/b/a*
*TGS Geological Products and Services*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing pleading was served via electronic mail on the 30th day of July, 2020 upon all parties in interest listed on the ECF service list

*/s/ Andrew A. Braun*