# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| WHITING PETROLEUM CORPORATION, *et al.*,[1] | § | Case No. 20-32021 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

## APPLICATION FOR ALLOWANCE OF CERTAIN ADMINISTRATIVE CLAIMS OF (I) ARGUELLO INC. AND (II) FREEPORT-MCMORAN OIL & GAS LLC, INDIVIDUALLY AND IN ITS CAPACITY AS THE DESIGNATED POINT ARGUELLO UNIT OPERATOR

**THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON NOVEMBER 17, 2020 AT 2:00 PM (CENTRAL TIME) IN COURTROOM 400, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AUDIO/VIDEO CONNECTION.**

**PLEASE NOTE THAT ON MARCH 24, 2020, THROUGH THE ENTRY OF GENERAL ORDER 2020-10, THE COURT INVOKED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY CONDITIONS. IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.**

---

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, are: Whiting Canadian Holding Company Unlimited Liability Corporation (3662); Whiting Petroleum Corporation (8515); Whiting US Holding Company (2900); Whiting Oil and Gas Corporation (8829); and Whiting Resources Corporation (1218). The location of the Reorganized Debtor's service address is: 1700 Lincoln Street, Suite 4700, Denver, Colorado 80203.

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S REGULAR DIAL-IN NUMBER. THE DIAL-IN NUMBER IS 832-917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. YOU WILL BE ASKED TO KEY IN THE CONFERENCE ROOM NUMBER. JUDGE JONES' CONFERENCE ROOM NUMBER IS 205691.**

**YOU MAY VIEW VIDEO VIA GOTOMEETING. TO USE GOTOMEETING, THE COURT RECOMMENDS THAT YOU DOWNLOAD THE FREE GOTOMEETING APPLICATION. TO CONNECT, YOU SHOULD ENTER THE MEETING CODE "JUDGEJONES" IN THE GOTOMEETING APP OR CLICK THE LINK ON JUDGE JONES' HOME PAGE ON THE SOUTHERN DISTRICT OF TEXAS WEBSITE. ONCE CONNECTED, CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF THE HEARING. TO MAKE YOUR ELECTRONIC APPEARANCE, GO TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE AND SELECT "BANKRUPTCY COURT" FROM THE TOP MENU. SELECT "JUDGES' PROCEDURES," THEN "VIEW HOME PAGE" FOR JUDGE JONES. UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE". SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN TWENTY-ONE DAYS FROM THE DATE THIS APPLICATION WAS FILED. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

TO THE HONORABLE DAVID R. JONES, CHIEF UNITED STATES BANKRUPTCY JUDGE:

Arguello Inc. and Freeport-McMoRan Oil & Gas LLC ("FMOG"), individually and in its capacity as the designated Point Arguello Unit Operator (collectively, with Arguello Inc., sometimes hereto to as the "Freeport-McMoRan Entities" or the "Claimants"), file this Application (this "Application") for Allowance of Certain Administrative Claims (the "Claims") against Whiting Petroleum Corporation ("Whiting Petroleum") and Whiting Oil & Gas Corporation ("Whiting Oil & Gas" and, collectively, "Whiting"). This Application is filed without waiving the Claimants' rights to contend, among other things, that certain of the Claims arise on or after

September 1, 2020, and, therefore, do not constitute Administrative Claims within the meaning of the Plan and Confirmation Order (as defined below), or that the Claims should be determined in an adversary proceeding.  In support of this Application, the Claimants show as follows:

## PRELIMINARY STATEMENT[2]

1.      The Freeport-McMoRan Entities file this Application out of an abundance of caution to preserve their rights of subrogation against the Reorganized Debtors to the extent that such rights arise prior to the Effective Date of September 1, 2020, which (as explained below) would entitle the Freeport-McMoRan Entities to an administrative claim based on the application of the Outer Continental Shelf Lands Act (the "OCSLA") and California law.

2.      Contemporaneously with the filing of this Application, the Freeport-McMoRan Entities shall confer with the Reorganized Debtors to determine whether litigation of these issues is necessary.

## JURISDICTION AND VENUE

3.      Whiting commenced voluntary chapter 11 cases on April 1, 2020 (the "Petition Date").

4.      This Court has jurisdiction over this Application pursuant to 28 U.S.C. § 1334(a). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## BACKGROUND

**A.      The Chapter 11 Case and Plan**

5.      On August 14, 2020, this Court entered an order [Docket No. 733] (the "Confirmation Order") confirming the *Fourth Amended Joint Chapter 11 Plan of Reorganization*

---

[2] Capitalized terms used in this Preliminary Statement are defined elsewhere in this Application.

*of Whiting Petroleum Corporation and its Debtor Affiliates* [Docket No. 711] (with all supplements and exhibits thereto, the "Plan").[3]

6.      On September 1, 2020, Whiting filed a *Notice of (a) Entry of Order (I) Confirming The Joint Chapter 11 Plan Of Reorganization of Whiting Petroleum Corporation and Its Debtor Affiliates and (II) Granting Related Relief, and (b) Occurrence of Effective Date* [Docket No. 756] (the "Notice"). In the Notice, the Reorganized Debtors notified the Court and parties in interest that the "Effective Date" of the Plan occurred on September 1, 2020 and that the Administrative Claims Bar Date[4] was thirty days after such Effective Date.

7.      Pursuant to the Plan, "Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, stopped, and enjoined from asserting such Administrative Claims against the Debtors or the Reorganized Debtors, and such Administrative Claims shall be deemed compromised, settled, and released as of the Effective Date." Plan, Art. IV(a), at 20.

8.      This Application constitutes a request for payment, made before the Administrative Claim Bar Date, in accordance with the Plan, to the extent the Court should determine that the Claims arose before the Effective Date of the Plan.

---

[3] Capitalized terms used but not defined herein have the meaning given them in the Confirmation Order, including, where applicable, by reference to the definitions in the Plan.

[4] An "Administrative Claim" is defined in the Plan as "a Claim against any of the Debtors arising on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases entitled to priority under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; .. . ." Plan, Art. I(a)(11), at 5. The "Administrative Claims Bar Date" is defined in the Plan as the "the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date." *Id.* Art. I(a)(12), at 5.

**B.      The Point Arguello Unit and Related Agreements**

9.      This Application relates to Point Arguello Unit in the Point Arguello Field, Offshore California (the "Point Arguello Unit"), which unit included the following Federal leases: OCS-P0315; OCS-P0451; OCS-P0316; and OCS-P0450. The Point Arguello Unit was created for the exploration, development, and production of the unitized substances, as well as related abandonment and decommissioning obligations, pursuant to that certain unit agreement, dated effective October 1, 1996 (the "Point Arguello Unit Agreement"), by and among The United States of America, Whiting Petroleum, and others.

10.      This Application also relates to the following agreements related to the Point Arguello Unit (collectively, with the Point Arguello Unit Agreement, the "Agreements"):

(a)      that certain Unit Operating Agreement (Point Arguello Unit, Pacific Offshore, California), effective October 1, 1996 (the "Original Unit Operating Agreement"),[5] by and among Whiting Petroleum, Texaco Exploration and Production Inc. ("Texaco"), Sun Operating Limited Partnership ("Sun"), Pennzoil Exploration and Production Company ("Pennzoil"), Koch Industries, Inc. ("KII"), Oxbow Energy Inc. ("Oxbow"), Chevron U.S.A. Inc. ("Chevron USA"), and Phillips Petroleum Company ("Phillips").

(b)      that certain First Amendment to the Unit Operating Agreement, effective March 1, 1998 (the "First Amendment,"[6] and, together with the Original Unit Operating Agreement, the "Point Arguello Unit Operating Agreement, as Amended"), by and among Whiting Petroleum, Texaco, Sun, Pennzoil, KII, Oxbow, Chevron USA, and Phillips Pt. Arguello Production Company, formerly Phillips ("Phillips St. Arguello").

(c)      that certain Decommissioning Management Agreement (Point Arguello Unit), made and entered into as of September 30, 1999 (the "Point Arguello DMA"),[7] by and between Arguello Inc. (in its capacity as Chairman of the Management Steering Committee and Operator of the Point Arguello Unit) and Chevron Environmental Management ("CEMC").

---

[5] A copy of the Original Unit Operating Agreement is attached as **Exhibit 1**.
[6] A copy of the First Amendment is attached as **Exhibit 2**.
[7] A copy of the Point Arguello DMA is attached as **Exhibit 3**.

11.     On information and belief, effective May 21, 2007, (a) Whiting Petroleum transferred its interests in the Point Arguello Unit to Whiting Oil & Gas, and (b) Whiting Oil & Gas assumed certain obligations as a working interest owner, and under (i) the Point Arguello Unit Operating Agreement, as Amended, (ii) the Point Arguello DMA, and (iii) other applicable law. Arguello Inc. and FMOG do not have a copy of the applicable documents and, therefore, do not know whether or to what extent Whiting Petroleum may still be liable for the Administrative Claims asserted herein.

12.     Pursuant to that certain Purchase and Sale Agreement, dated as of June 4, 1999 (the "Plains PSA"), Chevron USA and Chevron Pipe Line Company (collectively, "Chevron") sold their working interests and related properties in the Point Arguello Unit to Plains Resources, Inc. ("Plains"). Thereafter, through one or more mergers, FMOG became the direct or indirect owner of Plains, and/or its direct or indirect interests in the Point Arguello Unit. The Plains PSA governs the allocation of liability for abandonment of the Point Arguello Unit as between Chevron and FMOG; abandonment operations are ongoing.

13.     Pursuant to that certain Purchase and Sale Agreement, also dated July 22, 2002, The Largo Company and Phillips Pt. Arguello sold their working interests and related properties in the Point Arguello Unit to Arguello Inc.

14.     Following the foregoing acquisitions and mergers (among others not relevant to the instant Application), the ownership interest in the Point Arguello Unit was as follows:

| Entity | Interest |
|---|---|
| Arguello Inc. | 69.33883% |
| Devon Energy Production Company, L.P. | 10.32609% |
| Anadarko US Offshore LLC | 8.26087% |
| Koch Exploration Company, LLC | 4.30448% |
| Whiting Oil and Gas Corporation | 6.06521% |
| Harvest Energy, Inc. | 1.70452% |
|  | 100% |

15.     At the time of lease expiration, FMOG was the designated Point Arguello Unit Operator, as shown on the records of the United States Department of the Interior ("Interior"), Bureau of Safety and Environmental Enforcement. FMOG continues to act as Operator for purposes of decommissioning.

16.     At all relevant times, Whiting was one of the record title owners of Federal Leases OCS-P0451 and OCS-P0316, each included in the Point Arguello Unit.

17.     Although the leases included within the Point Arguello Unit expired on November 27, 2018, before the Petition Date, all entities to which decommissioning obligations "accrued" under Interior's regulations – including Whiting – remain jointly and severally liable to the United States Government for applicable abandonment and decommissioning obligations (to the extent that such obligations "accrued" to any given interest owner).  The Plan did not discharge such obligations.[8]

18.     As discussed in greater detail below, the Claimants are entitled to recover Whiting's proportionate share of the decommissioning obligations owed to the Government through subrogation to the Government's economic rights.

---

[8] The Plan provides that, "[a]s to the United States of America, its agencies, departments, or agents (collectively, the "United States") and/or any other Governmental Unit, nothing in the Plan, the Plan Supplement, or the Confirmation Order shall expand the scope of discharge, release, or injunction to which the Debtors or Reorganized Debtors are entitled under the Bankruptcy Code, if any. **The discharge, release, and injunction provisions contained in the Plan, the Plan Supplement, and the Confirmation Order are not intended and shall not be construed to bar the United States and/or any Governmental Unit from, subsequent to the Confirmation Order, pursuing any actions, including any police or regulatory action, against anyone**." Plan, Art. VII(k), at 48 (emphasis added). The Plan further provides that "nothing in the Plan or the Plan Supplement shall discharge, release, impair, or otherwise preclude: (a) any liability to the United States or any Governmental Unit that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (b) any valid right of setoff or recoupment of the United States and/or any Governmental Unit against any of the Debtors or Reorganized Debtors; or (c) the exercise of the United States' and/or any Governmental Unit's police and regulatory powers against the Debtors, the Reorganized Debtors, or any non-Debtor. Nor shall anything in the Confirmation Order, the Plan, or the Plan Supplement: (a) enjoin or otherwise bar the United States and/or any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in this paragraph, (b) divest any court, commission, or tribunal of jurisdiction from resolving any matters relating to the liabilities and/or claims set forth in this paragraph, or (c) confer in the Bankruptcy Court jurisdiction over any matter as to which it would not have jurisdiction under the Bankruptcy Code." *Id.*

### C.     The FMOG and Arguello Inc. Alternative Proofs of Claim

19.     Article V.B of the Plan provides as follows:

> Counterparties to Executory Contracts or Unexpired Leases listed on the
> Schedule of Rejected Executory Contracts and Unexpired Leases, if any,
> shall be served with a notice of rejection of Executory Contracts and
> Unexpired Leases with the Plan Supplement. Proofs of Claim with respect
> to Claims arising from the rejection of Executory Contracts and Unexpired
> Leases, if any, must be Filed with the Bankruptcy Court within 30 days after
> the date of the order of the Bankruptcy Court approving such rejection. Any
> Claims arising from the rejection of an Executory Contract or Unexpired
> Lease that are not Filed within such time will be automatically disallowed,
> forever barred from assertion, and shall not be enforceable against, as
> applicable, the Debtors, the Reorganized Debtors, the Estates, or property
> of the foregoing parties, without the need for any objection by the Debtors
> or Reorganized Debtors, as applicable, or further notice to, or action, order,
> or approval of the Bankruptcy Court or any other Entity, and any Claim
> arising out of the rejection of the Executory Contract or Unexpired Lease
> shall be deemed fully satisfied, released, and discharged, notwithstanding
> anything in a Proof of Claim to the contrary. Claims arising from the
> rejection of the Debtors' Executory Contracts and Unexpired Leases shall
> be classified as General Unsecured Claims and shall be treated in
> accordance with Article III of the Plan.

Plan, Art. V.B, at 34.

20.     The Schedule of Rejected Executory Contracts and Unexpired Leases (Schedule G)

was filed on August 14, 2020 [Docket No. 725] ("Schedule G"). Schedule G contains multiple

listings for a Unit Operating Agreement - Point Arguello - Pacific Offshore California (Schedule

G, at page 200 of 202), with the Debtor party being listed as Whiting Oil & Gas, each listing

presumably referring to the Point Arguello Unit Operating Agreement, as Amended.

21.     Schedule G also contains multiple listings for a "Decommissioning Management

Agreement – Point Arguello Unit" (Schedule G, at page 200 of 202), with the Debtor party being

listed as Whiting Oil & Gas, each listing presumably referring to the Point Arguello DMA.[9]

---

[9] The Claimants reserve all rights to contend that the Point Arguello DMA is not an Executory Contract with
the Claimants. Further, it should be noted that the Point Arguello Unit Agreement is not listed on Schedule G.

22.     On September 14, 2020, FMOG and Arguello Inc. each filed Rejection Damages Proofs of Claim (collectively, the "Rejection Damages Claims") in both Whiting Petroleum (claims nos. 48-2 and 49-2) and Whiting Oil & Gas (claims nos. 32-2 and 33-2) (collectively, the **"Rejection Damages Claims"**). As noted therein, the Rejection Damages Claims were filed out of an abundance of caution, and as an alternative to, and in the event that a court should hereafter determine that, (i) FMOG and Arguello Inc. do not hold any applicable Administrative Claims, or (ii) the claims asserted therein arose after August 31, 2020 within the meaning of the Plan and Confirmation Order.

## WHITING'S SHARE OF THE DECOMMISSIONING COSTS ARE RECOVERABLE THROUGH AN ADMINISTRATIVE EXPENSE CLAIM

### A.     Decommissioning Obligations Owed to the Government Are Administrative Claims

23.     As noted above, "Administrative Claim" is defined by the Plan as "a Claim against any of the Debtors arising on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases entitled to priority under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code[.]" Plan, Art. I(a)(11), at 5. Under the Bankruptcy Code, "actual necessary costs and expenses of preserving [an] estate" are allowable "administrative expenses" that are entitled to priority. 11 U.S.C. §§ 503(b)(1)(A), 507(a)(2).[10] Although section 503 is "silent regarding when expenses of a debtor in a reorganization case cease to be accorded administrative priority[,]"[11] the Plan is clear that administrative claims include "the actual and necessary costs and expenses incurred on or after the Petition Date until and including

---

[10] Allowing administrative expense claims serves the important purpose of incentivizing other parties "to provide the goods and services necessary for a successful reorganization." 4 Collier on Bankruptcy ¶ 503.06[2] (Richard Levin & Henry J. Sommers eds., 16th ed.).

[11] *Id.*

the Effective Date of preserving the Estate and operating the Debtor's business." Plan, Art. I(a)(11), at 5.

24.     Under federal regulations, "[l]essees and owners of operating rights are jointly and severally responsible for meeting decommissioning obligations for facilities on leases, including the obligations related to lease-term pipelines, as the obligations accrue and until each obligation is met." 30 C.F.R. § 250.1701(a). Further, decommissioning obligations "accrue" when a lessee or operating rights owner

> (a) Drill[s] a well;
>
> (b) Install[s] a platform, pipeline, or other facility;
>
> (c) Create[s] an obstruction to other users of the OCS;
>
> (d) [Is] or become[s] a lessee or the owner of operating rights of a lease on which there is a well that has not been permanently plugged according to this subpart, a platform, a lease term pipeline, or other facility, or an obstruction;
>
> (e) [Is] or become[s] the holder of a pipeline right-of-way on which there is a pipeline, platform, or other facility, or an obstruction; or
>
> (f) Re-enter[s] a well that was previously plugged according to this subpart.

*Id.* § 250.1702. Finally, all platforms and other facilities "must" be removed "within 1 year after the lease or pipeline right-of-way terminates, unless" otherwise approved by Interior. *Id.* § 250.1725.

25.     In *Midlantic National Bank v. New Jersey Department of Environmental Protection*, the United States Supreme Court held that under 28 U.S.C. § 959(b), a trustee may not abandon property through bankruptcy (and pursuant to section 554(a) of the Bankruptcy Code) when that abandonment would be "in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." 474 U.S. 494,

507 (1986) (emphasis added). Relying on *Midlantic*'s holding, courts in the Fifth Circuit have considered whether administrative agencies seeking to recover decommissioning costs from a bankruptcy estate have an administrative claim for those costs. In *Texas v. Lowe (In re H.L.S. Energy Co.)*, the Fifth Circuit concluded that a State's claim for the recovery of post-petition costs incurred to satisfy plugging and abandonment obligations that became enforceable *post-petition* was entitled to priority as an administrative expense. 151 F.3d 434 (5th Cir. 1998) (by performing an obligation of the estate's – *viz.*, plugging the wells – the State had benefitted the estate and, therefore, the costs were "actual, necessary costs and expenses of preserving the estate," warranting administrative priority (quoting 11 U.S.C. 503(b)(1)(A))). In *In re Am. Coastal Energy, Inc.*, the Bankruptcy Court for the Southern District of Texas concluded that "expenditures for remedying violations of environmental and safety laws [including decommissioning obligations owed to the state agency] are necessary to preserve the estate, *regardless of whether liability for the state law violation first occurred before or after the filing of a bankruptcy petition*." 399 B.R. 805, 816 (Bankr. S.D. Tex. 2009) (emphasis added) (obligation to plug and abandon wells became due – and the State ordered American Coastal to plug and abandon the wells – before American Coastal filed for bankruptcy; State performed the plugging work after American Coastal filed for bankruptcy). Based on this precedent, it is clear that decommissioning obligations to the Government that arise under Federal leases and related Federal regulations are not dischargeable in bankruptcy and that claims relating to those obligations "arise" "post-petition" for purposes of administrative priority.

**B.     Claimants Have a Right to Equitable Subrogation for Decommissioning Obligations**

   ***i.     OCSLA Applies California Law as Surrogate Federal Law***

26.     The filing of a bankruptcy petition does not create or define the substantive rights at issue in this Application. Instead, such rights and the interests are to be determined by state law

or applicable non-bankruptcy law. *See Butner v. United States*, 440 U.S. 48, 54-55 (1979); *Patterson v. Shumate*, 504 U.S. 753, 758 (1992).

27.     OCSLA governs the "submerged lands subject to the jurisdiction and control of the United States lying seaward and outside of the submerged lands within . . . State boundaries." 43 U.S.C. § 1333(a)(2)(A). As applicable herein, OCSLA contains an "explicit choice of law provision[,]" which "mandates" that courts apply the laws of the adjacent state as a surrogate federal law, to the extent that state law is applicable and not inconsistent with federal law.[12] Section 1333(a)(2)(A) of OCSLA reads, in relevant part:

> To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf . . . .

43 U.S.C. § 1333(a)(2)(A).

28.     In other words, in passing OCSLA, Congress intended for the law of the adjacent state to fill in any gaps rather than "federal courts fill those 'gaps' themselves by creating new common law."[13] Thus, under OCSLA, "the question is whether federal law has already addressed

---

[12] *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 479, 485-86 (1981) ("Congress was not unaware … of the close, longstanding relationship between the Shelf and the adjacent States[;]" citing 43 U.S.C. § 1333(a)(2)(A)); *Texaco Exploration & Prod., Inc. v. AmClyde Engineered Prods. Co.*, 448 F.3d 760, 772 (5th Cir. 2006), *cert. denied* 127 S. Ct. 670 (2006)); *Cutting Underwater Techs. USA, Inc. v. Con-Dive, LLC*, No. 09-387, 2011 U.S. Dist. LEXIS 29325, at *17 (E.D. La. Mar. 22, 2011) ("[U]nder the OCSLA, state law may be applicable to disputes arising out of the OCS, albeit 'only as surrogate federal law.'" (quoting *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 357 (1969))).

[13] *Gulf Offshore Co.*, 453 U.S. at 487-88 (quoting *Chevron Oil Co. v. Hudson*, 404 U.S. 97, 101-05 (1971), *overruled on other grounds by Harper v. Va. Dept. of Taxation*, 509 U.S. 86, 98-11 (1993)); *see also Texaco Expl. & Prod.*, 448 F.3d at 772 ("OCSLA extends federal law to the Outer Continental Shelf and borrows adjacent state law as a gap-filler.").

the relevant issue; if so, state law addressing the same issue would necessarily be inconsistent with existing federal law and cannot be adopted as surrogate federal law."[14]

29.    The Fifth Circuit applies a three-part test to determine when the law of the adjacent state must be applied as federal law: (1) the controversy arises "on a situs covered by OCSLA"; (2) federal law does not apply on its own force; and (3) state law is not inconsistent with federal law. *See, e.g.*, *Grand Isle Shipyward, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 783 (5th Cir. 2009) (en banc), cert. denied, 130 S. Ct. 3386 (2010) (quoting *Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990)) (referring to the 3-part choice-of-law test as the "PLT test"); *Texaco Expl. & Prod. v. Amclyde Engineered Prods.*, 448 F.3d 760, 774 (5th Cir. 2006)(finding, in the instance of the tort dispute, "the complaint arises on an OCSLA situs because the claims are inextricably linked to the construction of a platform permanently fixed to the Shelf for the purposes of development and would not have arisen but for such development").

30.    As to the first element, the OCSLA governs Claimants' right to equitable subrogation because the underlying obligations to the Government are based on activity commenced on the Outer Continental Shelf. *See* 43 U.S.C. § 1333(a)(2)(A) (defining the geographical reach of OCSLA); 30 C.F.R. § 250.1701(a) (describing decommissioning obligations); *see also Sojitz Energy Venture, Inc. v. Union Oil Co.*, 394 F. Supp. 3d 687, 705 (S.D. Tex. 2019) (applying Texas law to determine that equitable subrogation is available in the context of unpaid decommissioning obligations).

31.    On the second element, there is no federal law addressing the issue of equitable subrogation to apply here; for instance, maritime law is not implicated by Claimants' assertion of

---

[14] *Parker Drilling Mgmt. Servs. v. Newton*, 139 S. Ct. 1881, 1889 (2019) (state law "requiring payment" for standby time did not apply because federal regulations addressed the issue; state law setting minimum wage did not apply because the Fair Labor Standards Act addressed the issue).

equitable subrogation because such rights have no connection to navigable waters, no effect on maritime commerce, and no relationship to tradition maritime activity. *See, e.g.*, *Texaco Exploration & Prod., Inc.*, 448 F.3d at 770-71(applying a two-part test to determine whether maritime law applies: (A) whether the controversy involves a maritime location (i.e., navigable waters); and (B) whether the controversy has a connection with maritime activity); *Richardson v. Kerr-McGee Oil & Gas Corp.*, No. 08-1074, 2011 U.S. Dist. LEXIS 68641, at *4 (E.D. La. June 28, 2011).

32.     As to the <u>third element</u>, there is no inconsistency between California law and substantive federal law. With OCSLA, Congress "'extended' the application of federal law to the OCS 'as if the [OCS] were an area of exclusive Federal jurisdiction located within a State[]'" and "declared that '[t]o the extent that they are applicable and not inconsistent with [federal law],' the laws of the adjacent states are 'the law[s] of the United States' on the OCS." *Cutting Underwater Techs. USA, Inc. v. Con-Dive, LLC*, No. 09-387, 2011 U.S. Dist. LEXIS 29325, at *16-17 (E.D. La. Mar. 22, 2011) (quoting 43 U.S.C. § 1333). Here, the Claimants are entitled to subrogation pursuant to the California law doctrine of equitable subrogation, which constitutes the applicable federal law under OCSLA, because no federal law provides a claim for *equitable* subrogation to the rights of the Government arising from leases located on the OCS.[15]

---

[15] *But see In re Northstar Offshore Group, LLC*, No. 16-34028, 2020 Bankr. LEXIS 1811 (Bankr. S.D. Tex. July 10, 2020) (Isgur, J.) (concluding that equitable subrogation was not available against a liquidation trust based on application of 11 U.S.C. § 509). Judge Isgur's *In re Northstar* opinion is currently on appeal to the District Court before the Honorable George C. Hanks Jr., United States District Court Judge. The factual predicate of *In re Northstar* is materially distinguishable because it addresses decommissioning obligations in the context of the liquidation (and the rights of subrogation against a liquidation trust). *See id.* at *39 (relying on fact that liquidating trustee was "not operating a business in light of Northstar's sale of substantially all of its assets" and, thus, 28 U.S.C. § 509 did not apply). Further, the Claimants respectfully assert that the court's decision in *In re Northstar* misapplied OCSLA and the Supreme Court's recent decision in *Parker Drilling Mgmt. Servs.*, *supra*, to preclude application of state law to address an issue – equitable subrogation – that is *not* "already addressed" by Federal law.

ii.     *California Law Affords Claimants a Right to Equitable Subrogation*

33.     California law recognizes a "broad" remedy of equitable subrogation,[16] and courts applying California law consider the following factors in assessing a claim for recovery through equitable subrogation:

*First*: "Payment must have been made by the subrogee to protect his own interest."

*Second*: "The subrogee must not have acted as a volunteer."

*Third*: "The debt paid must be one for which the subrogee was not primarily liable."

*Fourth*: "The entire debt must have been paid."

*Fifth*: "Subrogation must not work any injustice to the rights of others."

*Caito v. United California Bank*, 20 Cal. 3d 694, 704 (Cal. 1978). Because "[e]quitable subrogation is not an inflexible rule of law, but is a broad and expansive doctrine in equity[,]" application of the doctrine is "not limited to circumstances where these five factors are met[.]"[17]

34.     While California has not traditionally been considered an oil-producing state as of late, the Southern District of Texas applied Texas law to find that a similarly-situated claimant held an equitable right of subrogation regarding OCSLA decommissioning costs. *Sojitz Energy Venture, Inc.*, 394 F. Supp. 3d at 704. In doing so, the District Court applied the following similar factors under Texas law in recognizing the claimant's right to equitable subrogation:

*First*: the claimant "involuntarily paid a debt";

*Second*: the debt was primarily owed by another; and

*Third*: the situation favored equitable relief.

---

[16] *See Hans v. U.S.*, 944 F.2d 526 (9 Cir. 1991) (finding that equitable subrogation applied).

[17] *Hans*, 944 F.2d at 529 (internal quotations and citations omitted); *see also Hamada v. Far E. Nat'l Bank (in re Hamada)*, 291 F.3d 645 (9th Cir. 2002) (regarding *Caito*, stating: "[T]he California Supreme Court has held explicitly that equitable subrogation is not limited to circumstances where the five factors are met.").

*Id.* (relying on *Frymire Eng'g Co. ex rel. Liberty Mut. Ins. Co. v. Jomar Int'l, Ltd.*, 259 S.W.3d 140, 142 (Tex. 2008)).

35.     Here, equity weighs in favor of finding that the Claimants are entitled to recovery of Whiting's share of the costs required to fulfill the decommissioning obligations owed to the Government.

36.     *First*, because each Claimant is liable to the Government for the decommissioning, to the extent that each Claimant has paid for Whiting's share of the decommissioning obligations, it has done so "to protect its own interest[.]" *Caito*, 20 Cal. 3d at 704.

37.     *Second*, because the decommissioning obligations owed to the Government are joint and several among Whiting and the Claimants, the Claimants' payment Whiting's share of the costs is not voluntary. *Cf. Sojitz Energy Venture, Inc.*, 394 F. Supp. 3d at 706 (applying Texas law and holding that Sojitz Energy Venture, Inc.'s performance of decommissioning obligations for which it was jointly and severally liable to the Government along with Union Oil Co. was not "voluntary" because "Sojitz was obligated by the government to conduct decommissioning") (report and recommendation adopted at No. H-17-2941, 2019 U.S. Dist. LEXIS 127982 (S.D. Tex., April 29, 2019)).

38.     *Third*, there is no question that Whiting is primarily liable for the decommissioning obligations under the applicable regulations. That the Claimants are jointly and severally liable to the Government for the decommissioning obligations does not render equitable subrogation inapplicable in this case. Indeed, the California Supreme Court has itself made clear that, depending on the circumstances, a primarily liable entity might still be entitled to recovery through equitable subrogation where such recovery would achieve an equitable result. *Caito*, 20 Cal. 3d at

705 ("Even the fact the Caitos [who relied on equitable subrogation] were primarily obligated to the Bank for the full amount of the debt might be offset on equitable grounds.").[18]

39.     **Fourth**, although the decommissioning obligations are ongoing, there is no question that the Claimants have incurred substantial costs of decommissioning to-date and that Claimants will incur substantial additional costs to satisfy the decommissioning obligations jointly and severally owed by Claimants and Whiting to the Government. Indeed, the decommissioning obligations themselves accrued under the Federal regulations long ago.  Given this context, a liberal application of the fourth factor of the analysis is warranted.

40.     **Fifth**, no injustice would result from the application of equitable subrogation in this case. Because the Claimants seek to recover only Whiting's share of the decommissioning liability (and not more than that share), Whiting will not suffer any injustice; rather, Whiting will be held liable for its share of the decommissioning obligations owed to the Government, which obligations were not discharged through the bankruptcy. *See supra* ¶ 17, n. 8 and accompanying text. Neither will there be any inequity to the Government, given that the Claimants will fully satisfy the decommissioning obligations relating to the Unit.[19] To the contrary, not applying equitable subrogation here would result in a substantial injustice to the Claimants, who are actively pursuing

---

[18] *Cf. Continental Casualty Co. v. Zurich Ins. Co.*, 57 Cal. 2d 27 (Cal. 1961) (applying equitable subrogation and stating: "Under general principles of equitable subrogation … all obligated [insurance] carriers who have refused to defend should be required to share in the costs of the insured's defense, whether such costs were originally paid by the insured himself or by fewer than all of the carriers.  A contrary result would simply provide a premium or offer a possible windfall for the insurer who refuses to defend, and thus, by leaving the insured to his own resources, enjoys a chance that the costs of defense will be provided by some other insurer at no expense to the company which declines to carry out its contractual commitments. . . . The fact[] that . . . each insurer independently owes [the same] duty to its insured[] constitute[s] no excuse for any insurer's failure to perform.").

[19] *Cf. Barnes v. U.S.*, No. C-97-1361 SC, 1998 U.S. Dist. LEXIS 19615, at *14-15 (N.D. Cal. 1998) ("[A]llowing Plaintiffs to be equitably subrogated to the IRS would not work any injustice on the rights of others. Plaintiffs would simply take the place of the IRS as Defendants' creditors. This would not work any injustice on the rights of the Defendants. All three Robinson siblings are statutorily required to pay the Estate's taxes. . . .  They have no right . . .  to escape their responsibility to the IRS.").

satisfaction of the decommissioning obligations for which the Claimants and Whiting are jointly and severally liable.

41.     It does not appear that any court has yet addressed the application of the doctrine of equitable subrogation under California law with respect to the Government's economic rights relating to decommissioning obligations arising under Federal leases and Federal regulations. However, applying the laws of other states, "courts have previously recognized a right to subrogation for parties co-liable to the government for decommissioning." *Sojitz Energy Ventures, Inc.*, 394 F. Supp. 3d at 707. *See e.g.*, *In re Tri-Union Dev. Corp.*, 314 B.R. 611, 622 (Bankr. S.D. Tex. Sept. 3, 2004); *In re ATP Oil & Gas Corp.*, No. 12-36187, 2013 Bankr. LEXIS 2608, at *8 (Bankr. S.D. Tex. June 19, 2013); *In re Tri-Union Dev. Corp.*, 479 B.R. 425, at *12-*13 (Bankr. S.D. Tex. Sept. 3, 2012). Under California law, the doctrine "is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter[,]" *Caito*, 20 Cal. 3d at 704, and "is sufficiently elastic to take within its remedy cases of first instance which fairly fall within it." *In re Estate of Johnson*, 240 Cal. App. 2d 742, 744-45 (1966).  For the reasons explained above, although this matter presents a question of first impression under California law, the Claimants' recovery from Whiting through the doctrine of equitable subrogation squarely falls within the reach and equitable nature of the doctrine.

42.     Separate and apart from equitable subrogation under California law, the Claimants are subrogated to the rights of Interior pursuant to 11 U.S.C. § 509(a), which provides that "an entity that is liable with the debtor on . . . a claim of a creditor against the debtor, and that pays

such claim, is subrogated to the rights of such creditor."[20] Here, because the Claimants are "liable with [Whiting]" with respect to the decommissioning obligations, and because the Claimants have paid – and will continue to pay – costs necessary to satisfy those obligations, the Claimants are entitled to subrogation under section 509(a).[21]

43.       As explained above, the Plan limits the definition of "Administrative Claim" to include costs incurred "on or after the Petition date until and including the Effective Date." Plan, Art. I(a)(11), at 5. Out of an abundance of caution, the Claimants' arguments above address the Claimants' right to recover Whiting's share of the decommissioning costs incurred after August 31, 2020. If the Court agrees that any claims relating specifically to decommissioning costs incurred after August 31, 2020, do not constitute an "Administrative Claim" as defined by the Plan, then the Court need not reach the substantive issue of whether the Claimants can recover Whiting's share of decommissioning costs that were incurred – and continue to be incurred – *after* August 31, 2020, through equitable subrogation under California law or statutory subrogation under 11 U.S.C. § 509.

## SPECIFIC FACTS RELATED TO ADMINISTRATIVE CLAIMS

**A.       Claims Related to Costs Incurred Through August 31, 2020**

44.       Whiting is liable to the Claimants pursuant to the Point Arguello Unit Operating Agreement, as Amended, for its proportionate share of the joint interest billings that were issued by FMOG through August 31, 2020, in the aggregate amount of $684,430.05;[22] provided, however, that nothing in this Administrative Claim is intended to impair or otherwise affect the rights of the

---

[20] Where an underlying claim has not been fully paid, subrogation under section 509 still applies, but the co-debtor's claim through subrogation is "subordinat[ed] to the claim of a creditor . . . until such creditor's claim is paid in full." 11 U.S.C. § 509(c).
[21] *But see In re Northstar Offshore Group, LLC*, No. 16-34028, 2020 Bankr. LEXIS 1811 (Bankr. S.D. Tex. 2020) (Isgur, J.).
[22] The invoices, and any other document related to the $684,430.05 will be made available upon request.

Claimants regarding any claim that does not constitute an Administrative Claim under the Plan or that is not dischargeable through bankruptcy.

45.     If, after sixty (60) days following the delivery of the Notice of Default,[23] FMOG, as the Point Arguello Unit Operator, has not received full reimbursement from a defaulting working interest owner (the "Net Default Amount"),[24] each non-defaulting party is obligated to pay the Net Default Amount in proportion to its interest in the Arguello Unit, excluding the defaulting Party's Participating Interest, as defined in the Point Arguello Unit Operating Agreement, as Amended.  As of the Petition Date, one of the working interest owners, Harvest Energy, Inc. ("Harvest"), was and has remained thereafter in default, thereby creating liabilities for certain related Net Default Amounts.  Through August 31, 2020, Whiting's share of the Net Default Amount equals $6,600.96;[25] provided, however, that nothing in this Administrative Claim is intended to impair or otherwise affect the rights of the Claimants regarding any claim that does not constitute an Administrative Claim under the Plan or that is not dischargeable through bankruptcy.

**B.     Claims Related to Costs Incurred After August 31, 2020**

46.     For the period after August 31, 2020, Whiting is also liable to the Claimants for Whiting's proportionate share of the costs incurred to satisfy the decommissioning obligations joint and severally owed by Whiting and the Claimants to the Government, as allocated among the Claimants and Whiting under the Point Arguello Unit Operating Agreement, as Amended,

---

[23] The First Amendment provides, among other things, that the Point Arguello Unit Operator shall deliver to the defaulting Party a Notice of Default which shall specify the default in the Unit Operating Agreement, as Amended, and the actions to be taken to cure the default. First Amendment, at Section 11.8(a).

[24] Capitalized terms used in this paragraph shall have the meanings ascribed to them in the First Amendment, Exhibit 2.

[25] The invoices, and any other document related to amounts owed for the Net Defaulting Amount, will be made available upon request.

estimated to be at least $25,065,000; provided, however, that nothing in this Administrative Claim is intended to impair or otherwise affect the rights of the Claimants regarding any claim that does not constitute an Administrative Claim under the Plan or that is not dischargeable through bankruptcy.

47.     For the period after August 31, 2020, Whiting is liable to the Claimants for its proportionate share of Harvest's Net Default Amount, estimated to be at least $435,000; provided, however, that nothing in this Administrative Claim is intended to impair or otherwise affect the rights of the Claimants regarding any claim that does not constitute an Administrative Claim under the Plan or that is not dischargeable through bankruptcy.

48.     Finally, Whiting is also liable to the Claimants for Whiting's proportionate share of the costs to be billed by CEMC for decommissioning offshore platforms and related facilities, for which the Claimants and Whiting are jointly and severally liable to the Government, as allocated among Whiting and the Claimants under the Agreements (the "DMA Obligations").  *See, e.g*., Point Arguello DMA, at Section 4.  As Whiting fails to satisfy its DMA Obligations, the Claimants may have obligations to reimburse CEMC for a portion of such unpaid DMA Obligations, which amount is estimated to be at least $60,000,000; provided, however, that nothing in this Application is intended to (a) impair or otherwise affect the rights of the Claimants regarding its alternative assertions in the Proofs of Claim, (b) constitute a waiver of any rights, claims, or defenses related to the Point Arguello DMA against any non-Debtor party, or (c) impair or otherwise affect the rights of the Claimants regarding any claim that does not constitute an Administrative Claim under the Plan or that is not dischargeable through bankruptcy.

49.     The figures provided in paragraphs 46-48 are estimates, and the Claimants reserve the right to amend this Application for Allowance of Certain Administrative Claims to adjust these figures as appropriate.

## ADDITIONAL RESERVATION OF RIGHTS

50.     The Claimants reserve the right to amend or supplement this Application, including, without limitation, the right to: (i) add documents; (ii) assert additional indemnity, contribution, or similar rights, claims or defenses; or (iii) change priority and fix, increase, or amend in any respect the amounts and claims referred to herein.

51.     The Claimants do not waive any rights at law or equity or any rights or causes of action that they have or may have against any person, including, but not limited to, the Reorganized Debtors and their affiliates, or any non-Debtor party related to the Point Arguello Agreements. This Application is not intended to be, and shall not be construed as: (i) an election of remedies; (ii) a waiver of any defaults; (iii) an admission as to the jurisdiction of this Court or a waiver to contest the jurisdiction of this Court; (iv) a waiver of the right to trial by jury in this Court or any other court in any proceeding, notwithstanding the designation or not of any matter as a "core proceeding" pursuant to 28 U.S.C. §157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (v) a waiver of the contractual right to arbitration; (vi) a release of the Claimants' right to have any and all final orders in any and all non-core matters or proceedings entered only after a de novo review by a United States District Court judge; (vii) a waiver of the right to withdraw the reference with respect to the subject matter of their Proofs of Claim, any objection thereto or other proceeding which may be commenced in these cases against or otherwise involving the Claimants; or (viii) a waiver or limitation of any rights, remedies, claims, or interests of the Claimants.

52.      The Claimants reserve the right to contend that certain of the Claims arise after September 1, 2020, and, therefore, do not constitute Administrative Claims within the meaning of the Plan and Confirmation Order, or that the Claims should be determined in an adversary proceeding

WHEREFORE, Arguello Inc. and Freeport-McMoRan Oil & Gas LLC, individually and in its capacity as the designated Point Arguello Unit Operator, request an order granting this Application for Allowance of Certain Administrative Claims.


[Continues on next page.]

Dated: October 1, 2020     Respectfully submitted,

            **JONES WALKER LLP**

             */s/ Joseph E. Bain*
            Joseph E. Bain
            Texas Bar No. 24085187
            Gabrielle A. Ramirez
            Texas Bar No. 24116937
            811 Main Street, Suite 2900
            Houston, Texas 77002
            Tel: 713-437-1800
            Fax: 713-437-1801
            Email: jbain@joneswalker.com
               gramirez@joneswalker.com

            -and-

            Elizabeth J. Futrell
            S.D. Tex. No. 440752
            Sarah Y. Dicharry
            (*Pro Hac Vice Application Filed*)
            201 St. Charles Avenue, 49th Floor
            New Orleans, Louisiana 70170
            Tel: 504-582-8368
            Fax: 504-589-8368
            Email: efutrell@joneswalker.com
               sdicharry@joneswalker.com

            ***Counsel to Arguello Inc. and Freeport-McMoRan Oil & Gas LLC, individually and in its capacity as the designated Point Arguello Unit Operator***

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 1, 2020, I caused a copy of the foregoing document to be served by electronic mail to all recipients below.

| | |
|---|---|
| **Reorganized Debtors** | **Whiting Petroleum Corporation**<br>Attn: Bruce R. DeBoer (bruced@whiting.com) |
| **Counsel to Debtors** | **Kirkland & Ellis LLP**<br>Attn: Brian Schartz, P.C. (brian.schartz@kirkland.com); Anna Rotman, P.C. (anna.rotman@kirkland.com); Stephen Hessler, P.C. (stephen.hessler@kirkland.com); Gregory F. Pesce (gregory.pesce@kirkland.com)<br><br>**Jackson Walker L.L.P.**<br>Attn: Matthew D. Cavenaugh (mcavenough@jw.com); Jennifer F. Wertz (jwertz@jw.com); Veronica A. Polnick (vpolnick@jw.com) |
| **Counsel to the RBL Agent** | **Simpson Thacher & Bartlett LLP**<br>Attn: Sandeep Qusba, Esq. (squsba@stblaw.com); Kathrine A. McLendon, Esq. (kmclendon@stblaw.com) |
| **Counsel to the Consenting Creditors** | **Paul, Weiss, Rifkind, Wharton & Garrison LLP**<br>Attn: Andrew N. Rosenberg (arosenberg@paulweiss.com); Alice Belisle Eaton (aeaton@paulweiss.com); Michael M. Turkel (mturkel@paulweiss.com); Omid Rahnama (orahnama@paulweiss.com)<br><br>**Porter Hedges LLP**<br>Attn: John F. Higgins (jhiggins@porterhedges.com); Eric M. English (eenglish@porterhedges.com); Genevieve M. Graham (ggraham@porterhedges.com) |
| **Counsel to the Creditors' Committee** | **Pachulski Stang Ziehl & Jones LLP**<br>Attn: Robert J. Feinstein (rfeinstein@pszjlaw.com); Jeffrey N. Pomerantz (jpomerantz@pszjlaw.com) |

*/s/ Joseph E. Bain*
Joseph E. Bain

## Schedule of Exhibits

| Ex. | Description |
|-----|-------------|
| 1 | Original Unit Operating Agreement |
| 2 | First Amendment |
| 3 | Point Arguello DMA |